**ERVIN AND ASSOCIATES, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 01–153C.

United States Court of Federal Claims.

Filed: Jan. 20, 2004.

Corrected Copy Filed: Jan. 21, 2004.

Joseph P. Hornyak and Renee C. Macri, Sonnenschein, Nath & Rosenthal, Washington, D.C., counsel for plaintiff Ervin and Associates, Inc.

Carolyn J. Craig and Lisa B. Donis, United States Department of Justice, Commercial Litigation Branch, counsel for defendant, with whom were Assistant Attorney General Peter D. Keisler, Director David M. Cohen, and Assistant Director Mark A. Melnick. Of Counsel, Virginia Stephens Ackerman, United States Department of Housing and Urban Development, Office of General Counsel.

## MEMORANDUM OPINION

BRADEN, Judge.

This government contracting case raises an important issue concerning the scope of the Federal Acquisition Regulation ("FAR") "Rights In Data–General" Clause that neither the United States Court of Federal Claims nor the United States Court of Appeals for the Federal Circuit has had an occasion to consider. Since 1987, civilian federal contracts have included a standard "Rights In Data–General" Clause, which provides the federal government ("Government") with virtually "unlimited rights"[1] in technical data and computer software. *See generally* 48 C.F.R. § 27.000–27.601 (2003); Lionel M. Lavenue, "Database Rights and Technical Data Rights: The Expansion of Intellectual Property for the Protection of Databases," 38 Santa Clara L. Rev. 1 (1997). In fact, the "Rights In Data–General" Clause "does not provide any rights to the contractor, instead, these rights tend to limit rights that a contractor may have in data by requiring the license of the technology to the [G]overnment—effectively, a compulsory license. Indeed, in contrast to a patent or copyright, for which the [G]overnment may demand a license, the data rights regulations specifically require conditions under which a contractor must grant the [G]overnment specific, non-exclusive license rights. Notably, the data rights regulations define these conditions and requirements for the [G]overnment to take data rights in computer software and technical data independent of any rights in patent or copyright." Lionel M. Lavenue, *"Technical Data Rights in Government Procurement: Intellectual Property Rights in Computer Software and the Indicia of Information Systems and Information Technology,"* 32 U.S.F.L. Rev. 1, 29–30 (Fall 1997).[2]

---

1. FAR defines "unlimited rights" as "the right of the Government to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, in any manner and for any purpose, and to have or permit others to do so." 48 C.F.R. § 52.227–14(a).

2. The court wishes to acknowledge the significant contribution that Mr. Lavenue's scholarship has made in explaining the intricate mosaic of FAR that should be of interest to contractors and their counsel. Likewise, the Fall 2003 edition of the Section of Public Contract Law of the American Bar Association's Public Contract Law Journal, entitled, "Public Contracts & Intellectual

Therefore, "to fully protect and leverage intellectual property assets, companies that do business with the Government must be knowledgeable of these statutes and regulations as well as the underlying intellectual property laws. Failure to do so could give a company's competitors rights to use their intellectual property, or could cause the company to pass up unique opportunities for government investment in development." Nancy O. Dix, Fernand A. Lavellee, and Kimberly C. Welch, "Fear and Loathing of Federal Contracting," 33 PUB. CONTRACT LAW J. 1, 13 (Fall 2003). This case concerns an experienced and respected government contractor, Ervin and Associates, Inc. ("Ervin"), that has found itself in this exact situation.

## RELEVANT FACTS [3]

The court has presented an inclusive and lengthy discussion of the relevant facts because this case is the first in which the United States Court of Federal Claims has addressed the scope of the FAR "Rights In Data–General" Clause and also is the first of seven actions, discussed herein, to reach a final judgment.

### A. HUD's Office Of Multifamily Housing.

From 1993 through 1997, the relevant period in this case, the United States Depart-

Property," has assembled a number of articles with practical guidance about how to navigate FAR, that warrant the attention of all counsel who practice in this area. See, e.g., Matthew S. Simchek, "Practicing Rights In Technical Data and Computer Software: Applying the Ten Practical Rules and Their Corollaries," 33 PUB. CONTRACT LAW J., 140 (Fall 2003).

3. The relevant facts recited herein were derived from the following portions of the record: February 4, 2003 Defendant's Appendix to Defendant's Motion for Summary Judgment ("Def.App."); April 15, 2003 Plaintiff's Appendix of Exhibits ("Pl.Ex."); August 4, 2003 Defendant's Appendix ("Def.App.II"); April 11, 2003 Declaration of John Ervin ("J. Ervin Decl."); April 10, 2003 Declaration of Steve Ervin ("S. Ervin Decl."); April 10, 2003 Declaration of Brian Hunt ("Hunt Decl."); April 10, 2003 Declaration of Bernard Oleniacz, Esquire ("Oleniacz Decl."); July 28, 2003 Declaration of Kenneth F. Hannon ("Hannon Decl."); July 24, 2003 Declaration of Beverly Miller ("Miller Decl."); and July 24, 2003 Declaration of Lawrence Gnessin ("Gnessin Decl.").

ment of Housing and Urban Development ("HUD") managed a portfolio of approximately 16,000 HUD-insured and HUD-held loans worth $50 billion, secured by over two million multifamily apartment projects located throughout the United States. See J. Ervin Decl. at ¶ 6; PPF at ¶ 1. Each year, owners of these loans were required to submit an audited annual financial statement ("AFS") in hard copy to HUD. See J. Ervin Decl. at ¶ 7; PPF at ¶ 2. The length of an individual AFS form varied, but generally comprised 30 pages of financial and other business information. See J. Ervin Decl. at ¶ 8; PPF at ¶ 3. Prior to 1994, review of AFS forms was performed manually by HUD staff who determined whether an AFS complied with HUD regulations. See J. Ervin Decl. at ¶ 9; PPF at ¶ 3. A nonconforming AFS would result in a follow-up letter to the project owner. Id. Overall AFS compliance was the responsibility of the Office of Multifamily Housing ("OMH"), which was supervised by a Deputy Assistant Secretary ("DAS"). See J. Ervin Decl. at ¶ 6; PPF at ¶ 57.[4]

### B. On July 21, 1993, HUD Issued A Request For Proposals Regarding The AFS Forms.

On July 21, 1993, HUD issued a Request for Proposals No. DV100C000018266

Citations to other references herein include: February 4, 2003 Defendant's Motion for Summary Judgment ("Def.Mot.S. J."); February 4, 2003 Defendant's Proposed Findings of Uncontroverted Fact ("DPF"); April 15, 2003 Plaintiff's Cross–Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Pl.Cross–Mot.S. J."); April 15, 2003 Plaintiff's Proposed Findings of Uncontroverted Fact ("PPF"); April 15, 2003 Plaintiff's Response to Defendant's Proposed Findings ("PR"); July 29, 2003 Defendant's Reply and Opposition to Plaintiff's Cross–Motion ("Def.Reply"); July 29, 2003 Defendant's Responses to the Plaintiff's Proposed Findings ("DR"); and October 8, 2003 Plaintiff's Reply ("Pl.Reply").

4. From 1993 until 1995, the DAS for OMH was Ms. Helen Dunlap ("DAS Dunlap"). See Pl.Ex. 7 at 67; Pl.Ex. 15; PPF at ¶ 57. At the end of 1995, DAS Dunlap became HUD's DAS for Operations, but continued to remain involved in the multifamily property portfolio. Id.

("RFP"), seeking a contractor to collect and review AFS forms and provide draft follow-up letters to HUD. *See* Def.App. at 1–100.

The RFP's Statement of Work ("SOW") required that the successful contractor annually would review over 16,000 AFS forms and develop a "trend analysis" comparing the forms for the current year to those of the two previous years. *See* Def.App. at 8–14; DPF at ¶¶ 3–4. The SOW also required that the successful contractor survey the Independent Public Accountants that audit HUD partnerships and provide HUD with a "plan to automate the financial statement that is compatible with HUD's automatic systems considering fully the capability of the IPA[s]." Def.App. at 12. The purpose of this plan was to allow the AFS forms to be delivered to HUD electronically. *See* Def. App. at 12; DPF at ¶ 5. In addition, the initial SOW incorporated by reference several HUD handbooks that provided information regarding HUD requirements for review and analysis of the AFS forms. *See* Def.App. at 8, 365–553; DPF at ¶¶ 6–14.

The initial RFP was a cost-reimbursement plus fixed-fee contract with a closing date of August 20, 1993. *See* Def.App. at ¶¶ 1, 4–7; DPF at ¶ 2. The term was for one year with four option years. *See* Def.App. at ¶¶ 1, 4–7; PPF at ¶ 19; DPF at ¶ 2. The RFP included, or incorporated by reference, over seventy standard FAR contract clauses. *See* Def. App. at 65–100. HUD made six amendments to the initial RFP.

The first amendment extended the closing date to August 27, 1993. *See* Def.App. at 101–16; DPF at ¶ 30. On September 20, 1993, HUD issued a second amendment that changed the contract from cost-reimbursement to one for an indefinite quantity "fixed unit rate" and again extended the closing date. *See* Def.App. at 117–52; PPF at ¶¶ 27–28; DPF at ¶¶ 31–35. Contract Line Number ("CLIN") 0007 also was added to require the input of certain data elements into HUD's Field Office Multifamily National System ("FOMNS"). *Id.; see also* Def.App. at 120–23.

On September 23, 1993, HUD issued a third amendment that added pricing for CLIN 0008, "Automation and Procedures" to

the base year of the contract. *See* Def.App. at 147–60; PPF at ¶ 29; DPF at ¶¶ 36–37. In response to a question from a prospective offeror, HUD clarified that "[t]here is no system development required by the contractor." Def.App. at 156; PPF at ¶ 29; DPF at ¶ 37. In addition, the third amendment specifically requested best and final offers ("BAFOs") from five companies that previously had submitted offers technically acceptable to HUD. *See* Pl.Ex. 78; PPF at ¶ 30. At this stage, the RFP still retained its initial requirements of "trend analysis" and review of all 16,000 AFS forms each year. All of these initial offers, however, were priced at a level that exceeded the funds that HUD allotted for this project, requiring HUD to change the SOW. *See* Def.App. at 149; Pl.Ex. 78; PPF at ¶¶ 30–31.

On December 7, 1993, HUD issued a fourth amendment eliminating the CLIN 0001 ("Trend Analysis Report") and 0008 ("Automation and Procedures") requirements. *See* Def.App. at 161–99; PPF at ¶ 32; DPF at ¶ 38. Most important was the change in the number of AFS forms required to be reviewed from 100% to 30% of HUD's portfolio. *Id.* A new round of BAFOs again was requested. *Id.* A fifth amendment followed that extended the closing date until December 29, 1993. *See* Def.App. at 200–07; DPF at ¶ 39. On December 23, 1993, HUD issued a sixth and final amendment clarifying that completeness checks were required for all AFS forms, but the number of reviews was reduced from 100% to 30% of HUD's multifamily portfolio. *See* Def.App. at 207(a)–09; DPF at ¶ 40.

**C. Ervin's August 27, 1993, September 24, 1993, and December 29, 1993 "Technical Proposals" In Response To HUD's July 21, 1993 Request And Amendments Thereto.**

In 1989, Ervin began a business to provide acquisition, management, disposition, and financing services to owners and lenders with multifamily loan portfolios. *See* J. Ervin Decl. at ¶ 10; PPF at ¶ 4. The company's founder, John Ervin, previously was employed by the National Housing Partnership ("NHP"), a large owner and manager of sub-

sidized multifamily properties, where he was Executive Vice President for Asset Management and worked on computerized database systems used to manage a multifamily project portfolio. *See* J. Ervin Decl. at ¶¶ 3, 4, 10; PPF at ¶¶ 5, 66. John Ervin alleges that he negotiated an agreement with NHP to acquire rights to the "multifamily computerized database systems," used to manage NHP's 500–plus multifamily project portfolio. *See* J. Ervin Decl. at ¶ 10; PPF at ¶ 7.[5] Ervin hired Brian Hunt, a NHP computer programmer, and Velda Frisco, a NHP Financial Analyst. *See* J. Ervin Decl. at ¶ 10; PPF at ¶ 7. Ervin then began to develop and expand the centralized computer database systems that it acquired from NHP to create the Ervin Multifamily Information Systems ("EMFIS"). *See* J. Ervin Decl. at ¶¶ 11–12; PPF at ¶ 8 and n.3. In 1990, HUD awarded Ervin a Co–Insurance Contract. *See* S. Ervin Decl. at ¶ 4; Def.App. at 588–59; PPF at ¶¶ 22, 214; DR at ¶¶ 22, 214; *see also* Pl. Cross–Mot. at 4 ("Between 1989 and 1993, Ervin won and performed several contracts for HUD and others, each of which required Ervin to review and analyze AFSs."). In addition, Ervin attracted other institutional customers, including NHP, Wellington, Volunteers of America, and the SCA Foundation, all of which used Ervin's services to compile information regarding certain projects and their financial performances. *See* J. Ervin Decl. at ¶ 13.

In response to HUD's July 21, 1993 RFP, Ervin assembled a team of experts, including an accounting firm and a computer equipment and systems provider. *See* J. Ervin Decl. at ¶ 15; PPF at ¶ 21. On August 27, 1993, Ervin submitted a "Technical and Management Proposal" to HUD that described the EMFIS as a "series of *currently existing* interrelated database systems which contain data elements and text and are linked together to create sophisticated analysis for the portfolio of loans for which we [currently] assist HUD." Def.App. at 588–89; *see also*

PPF at ¶ 22 (emphasis added). Ervin's proposal stated that: "[t]he approach we intend to use to meet all of HUD's requirements is initially based on the concept that each of the similarities that are included or should be included in each of the 16,000 annual financial statements are susceptible to the pre-programmed standardized test[s] that can be performed by a computer exactly the same way each time." Def.App. at 595–96; *see also* PPF at ¶ 23.

Although HUD's fourth amendment eliminated the requirement for a trend analysis report and clarified that it would not require the selected contractor to develop a computer system, Ervin, nevertheless, believed HUD eventually would need a comprehensive computer database of financial statement data for all of its multifamily loans in the future and would allocate funds for these additional databases. *See* J. Ervin Decl. at ¶ 19; PPF at ¶¶ 33, 35. Therefore, Ervin's December 29, 2003 BAFO represented that Ervin would deliver to HUD reviews of all information entered into its database for each of HUD's 16,000 properties. *See* Def.App. at 987–88, 993; PPF at ¶ 36; DR at ¶ 36. Ervin's BAFO touted the company's "ability and desire to provide incremental value at no incremental cost." Def.App. at 979.

For example, Ervin represented that:

**We will be in a position to provide the HUD field offices with a comprehensive computerized review and draft findings letter on all 16,000 annual financial statements at *no additional cost to HUD*** .... Since we are proposing to provide a full computerized review on all 16,-000 financial statements at *no additional cost to HUD*, we also propose to complete a full inventory of all financial statement information instead of only the abbreviated review of the basic financial statements.... Since all important financial information will have been input and be available on the system we would expect to provide a ratio and trend analysis (on hard

---

5. It appears that NHP only granted Ervin "a perpetual license, by separate agreement, to utilize the computer programs and software previously developed by John Ervin while employed with NHP, to the extent permitted by the licenses and leases to which NHP is subject and so long as such systems and software are used to service NHP and other clients of [Ervin]." Pl.Ex. 12. Ervin did not proffer the NHP license nor any of the other "licenses and leases" to which NHP was subject, as evidence in this case. *See* DR at ¶¶ 7–8.

copy and diskette) for each and every project.

Def.App. at 982–83 (bold in original, other emphasis added).

Ervin further stated that:

Our approach, which is based on helping HUD to obtain an increasingly better understanding of all aspects of the portfolio each successive year, demands that we continue with some level of trend analysis (we will obviously share this analysis with HUD). By utilizing this centralized process approach not only will we become more efficient allowing the computer to do more and better work each year and produce a more consistent result, but we will also be much more effective for HUD. *We will take this approach not because we are forced to under the contract terms,* but because it makes good business sense for both HUD and for us. We further understand that the additional knowledge we can gain (and provide to HUD) through this process can make all of the other multifamily real estate services we offer to HUD more valuable. Because of this long term perspective we are more than willing to invest our best resources in building a truly superior and comprehensive system.

Def.App. at 985–86 (emphasis added).

In addition, Ervin promised:

Since our approach relies heavily on computer technology and ongoing use of information, we would expect to input more raw information initially into the computer system than others might. Although this might take slightly more time initially, it will improve the quality of the [financial statement] reviews and provide a greater level of information that will subsequently be used for portfolio level analysis and more sophisticated project level analysis.

Def.App. at 987–88. With the capability to analyze information from all the AFS forms, "Ervin's pre-programmed tests could perform statistical comparisons between or among multiple projects" and "financial analysis at the portfolio or regional level."[6] Hunt Decl. at ¶ 7; *see also* PPF at ¶ 11.

HUD received 13 proposals in response to the initial RFP. *See* Pl.Ex. 13; PPF at ¶ 26. Five, including Ervin's, were found to be technically acceptable. *Id.* Ervin's proposal was priced at $39,428,625, which was close to the average between $38 and $39 million. *Id.* Ervin's initial BAFO price, submitted in response to HUD's third amendment, was $37,197,500, compared to an average of more than $42 million for all competitors. *See* Pl.Ex. 78; PPF at ¶ 30. Ervin's final BAFO was priced at $12,328,000, compared to an average price of approximately $22 million. *See* J. Ervin Decl. at ¶ 20; Pl.Ex. 78; PPF at ¶ 38.

Ervin contends that the almost $25 million difference between its initial BAFO, priced at $37.2 million, and the second BAFO, priced at $12.3 million, related "almost exclusively to HUD's elimination of the trend and portfolio analyses requirement and the elimination of the effective requirement for database systems. *Based on this scope reduction any database improvements made by Ervin would be owned by Ervin.*" J. Ervin Decl. at ¶ 20 (emphasis added).

**D. On February 14, 1994, The AFS Contract Was Awarded To Ervin.**

On January 21, 1994, a Source Evaluation Board recommended awarding the contract to Ervin. *See* Pl.Ex. 13. On February 4, 1994, a Contracting Officer ("CO")[7] adopted that recommendation. *See* Pl.Ex. 78; PPF at ¶ 40. On February 14, 1994, HUD executed the AFS Contract Award. *See* Def.App. at 1044–90; PPF at ¶ 43. The AFS Contract Award included HUD's RFP, as amended, but prominently noted on the cover sheet that Ervin's "technical proposals, dated August 27, 1993, as amended September 24, 1993 and December 29, 1993, are hereby

---

6. Ervin's proposal concedes, however, that "any accountant is able to define some of these tests[.]" Def.App. at 595–96.

7. A "contracting officer" is defined as any person "who, by appointment in accordance with applicable regulations, has the authority to enter into and administer contracts and make determinations and findings with respect thereto. The term also includes the authorized representative of the contracting officer, acting within the limits of his authority." 41 U.S.C. § 601(3).

incorporated by reference and made part of this contract." Def.App. 1044; *see also* PPF at ¶ 43. On February 10 or 18, 1994 (the date is unclear), John Ervin signed the AFS Contract Award ("AFS Contract"). *See* Def. App. at 1044–90.[8] The AFS Contract Award was made in accordance with accepted practices of negotiated procurement on GSA's Standard Form 26, utilizing Block 17. *Id.*[9]

A Government Technical Monitor ("GTM"),[10] Ms. Beverly Miller, and a Government Technical Representative ("GTR"),[11] Mr. Ken Hannon, were assigned to oversee and monitor the AFS Contract, under DAS Dunlap's supervision. *See* Pl.Ex. 6 at 8; PPF at ¶¶ 59, 62. Shortly after the AFS Contract was finalized, responsibility for its implementation was transferred from HUD's Office of Procurement and Contracts, which provides administrative support, to the Program Support Division and assigned to Dolores Ammons–Barnett as the first CO for the AFS Contract. *See* Pl.Ex. 8 at 8, 46–47; PPF at ¶¶ 50–53. In addition, contract specialist George Chabot was assigned to the AFS Contract. *See* Pl.Ex. 14; PPF at ¶ 55.

After the AFS Contract was awarded, John Ervin "confirmed verbally" with GTR Hannon that Ervin had HUD's "permission to enter data from all 16,000 AFSs" into its databases. J. Ervin Decl. at ¶ 22; PPF at ¶ 69. Shortly after beginning to work on the AFS Contract, HUD informed Ervin that it did not have funding necessary to develop the software necessary for Ervin to load AFS data into HUD's FOMNS, as required by the terms of the AFS Contract. *See* J. Ervin Decl. at ¶ 22; Pl.Ex. 3 at 105–06, 109–10; PPF at ¶ 77; DR at ¶ 77. Instead, Ervin worked with HUD to create an "extract file" to transfer AFS data from the EMFIS to HUD's FOMNS database by disk and eliminate the need for this supplemental software. *See* Hunt Decl. at ¶ 15; PPF at ¶ 78. GTM Miller testified that Ervin was "willing to work around it with us" and was "very cooperative," and that as a result, she had a "very high opinion" of him. Pl.Ex. 3 at 111–12; *see also* PPF at ¶ 79; DR at ¶ 79.

HUD also awarded Ervin other contracts after the AFS Contract. In May 1994, Ervin was performing work for HUD under an "existing asset management contract to provide due diligence services for multi-family

---

**8.** A government contract becomes effective when the written award is mailed to the awardee, without further action by either party. *See* Steven Feldman, Government Contract Awards, Negotiation And Sealed Bidding, § 19:02 (2003). Accordingly, the parties may have a contract even before they execute their formal written agreement. *Id.* The initial RFP for the AFS Contract incorporated a standard FAR provision, which advised that "[a] written award or acceptance of offer mailed or otherwise furnished to the successful offeror within the time for acceptance specified ... shall result in a binding contract without further action by either party." 48 C.F.R. § 52.215–16(e) (1993).

According to this requirement, "[t]he Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, cost or price and other factors, specified elsewhere in this solicitation, considered." 48 C.F.R. § 52.215–16(a) (1993). In addition, "[t]he Government may award a contract on the basis of initial offers received, without discussions. Therefore, each initial offer should contain the offeror's best terms from a cost or price and technical standpoint." 48 C.F.R. § 52.215–16(c) (1993). These 1993 FAR provisions are now found at 48 C.F.R. § 52.215–1 (2003).

**9.** When the government "uses Block 17 of SF 26 to make the award, the offeror's proposal can ... be made part of the contract if there are terms in the contract incorporating the proposal or parts thereof, even though Block 18 is the usual mechanism for incorporating the offer into the contract." Feldman, *supra* n.8, at § 19:02.

In this case, Block 17 states that "[t]he rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein." Def.App. at 1044. Incorporated by reference, through a separate statement on the same page, were Ervin's "technical proposals, dated August 27, 1993, as amended September 24, 1993 and December 29, 1993[.]" *Id.*

**10.** The GTM provides technical monitoring on contracts and assists the GTR. *See* 48 C.F.R. § 2402.101. The GTM has no authority to change the scope or terms of a contract. *See, e.g.,* Miller Decl. at ¶ 3.

**11.** The GTR "serve[s] as the Contracting Officer's representative responsible for monitoring the technical aspects of a contract[.]" 48 C.F.R. § 2402.101. *See, e.g.,* Gnessin Decl. at ¶ 2; Hannon Decl. at ¶ 3 (Def.App. II at 66–68).

properties to be sold through its upcoming Note Sale Program." J. Ervin Decl. at ¶ 23. In August 1994, HUD's San Francisco Region awarded Ervin a "Delegated Processing" contract. *See* J. Ervin Decl. at ¶ 24; PPF at ¶ 81. This was followed by similar contracts awarded by five other regional HUD offices in Atlanta, Boston, Philadelphia, Kansas City, and Seattle. *Id.*

### E. The AFS Contract Referenced The FAR "Rights In Data–General" Clause.

The AFS Contract referenced the "Rights In Data–General" Clause. *See* 48 C.F.R. § 52.227–14; *see also* Def.App. at 1080. The "Rights In Data–General" Clause provides the Government with "unlimited rights" in the following categories of data:

Except as provided in paragraph (c) of this clause regarding copyright[12], the Government shall have unlimited rights[13] in–

(i) Data[14] first produced in the performance of this contract;

(ii) Form, fit and function data delivered under this contract;

(iii) Data delivered under this contract (except for restricted computer software[15]) that constitute manuals or instructional and training material for installation, operation, or routine maintenance and repair of items, components, or processes delivered or furnished for use under this contract; and

(iv) All other data delivered under this contract unless provided otherwise for limited rights data[16] or restricted computer software[17] in accordance with paragraph (g) of this clause.[18]

48 C.F.R. § 52.227–14(b)(1).

In addition to the "Rights In Data–General" Clause, the AFS Contract also contained

12. The FAR governs "data first produced in the performance of [a] contract. [However,] the prior, express written permission of the [CO] is required to establish claim to copyright subsisting in all ... data [other than articles for publication] first produced in performance of this contract. When claim to copyright is made, the Contractor shall affix the applicable copyright notices of 17 U.S.C. §§ 401 and 402 and acknowledgment of Government sponsorship (including contract number) to the data when such data are delivered to the Government, as well as when the data are published or deposited for registration as a published work in the U.S. Copyright Office. For data other than computer software the Contractor grants to the Government, and others acting on its behalf, a paid-up, non-exclusive, irrevocable worldwide license in such copyrighted data to reproduce, prepare derivative works, and perform publicly and display publicly by or on behalf of the Government." 48 C.F.R. § 52.227–14(c)(1).

The FAR further provides, in regard to "[d]ata not first produced in the performance of this contract," that "[t]he Contractor shall not, without prior written permission of the [CO], incorporate data delivered under this contract any data not first produced in the performance of this contract and which contains the copyright notice of 17 U.S.C. §§ 401 or 402, unless the Contractor identifies such data and grants to the Government, or acquires on its behalf a license of the same scope as set forth in subparagraph (c)(1) of this paragraph; provided, however, that if such data are computer software, the Government shall acquire a copyright license [as the parties specifically set forth in the contract or in

a collateral agreement]." 48 C.F.R. § 52.227–14(c)(2).

13. *Supra* n. 1.

14. The FAR defines "data" as "recorded information, regardless of the form of the media on which it may be recorded. The term includes technical data and computer software." 48 C.F.R. § 52.227–14(a).

15. The FAR defines "computer software" as "computer programs, computer data bases, and documentation thereof." 48 C.F.R. § 52.227–14(a).

16. The FAR defines "limited rights" as those in "data (other than computer software) that embody trade secrets or are commercial or financial and confidential or privileged, to the extent that such data pertain to items, components, or processes developed at private expense[.]" 48 C.F.R. § 52.227–14(a).

17. The FAR defines "restricted rights" as those in "restricted computer software," *i.e.*, "software developed at private expense and that is a trade secret; is commercial or financial and is confidential or privileged; or is published copyrighted computer software[.]" 48 C.F.R. § 52.227–14(a).

18. The FAR provides for the protection of limited rights data and restricted computer software: "When data *other than* data meeting the requirements of (b)(1)(i), (ii) or (iii) of this clause, are specified to be delivered under this contract *and*

an additional provision affecting data rights that specified: "If additional software and computer applications are developed to present the data specified under the contract, then such will be considered property of the Department (*e.g.*, computer generated 93484, 85, or 86.)." Def.App. at 1056.[19]

### F. In 1994, Third Parties Requested HUD For Access To AFS Data And/Or The EMFIS.

#### 1. The Grubman & Co. Request.

In July 1994, HUD received a Freedom of Information Act ("FOIA") request from Grubman & Company ("Grubman") for a list of the Certified Public Accountants that submitted AFS forms to HUD. *See* Pl.Ex. 23; J. Ervin Decl. at ¶ 25; PPF at ¶ 97; DR at ¶ 97. Grubman stated that it learned Ervin had compiled this information after being awarded the AFS Contract. *Id.* HUD denied the FOIA request, stating that the information requested was:

> not a contract, and was not requested, nor paid for by HUD. Therefore, the Department takes no exception to the release of this data if Ervin and Associates wishes to do so. You may wish to contact Ervin and Associates for a copy of the list.

Pl.Ex. 23; *see also* J. Ervin Decl. at ¶ 25; PPF at ¶ 98. Grubman then sent a copy of HUD's response to Ervin, but Ervin declined to release the data. *See* Pl.Ex. 24; J. Ervin Decl. at ¶ 26; PPF at ¶ 99.

#### 2. The Kerry Co. Request.

In August 1994, DAS Dunlap informed John Ervin that HUD was hiring Kerry Company ("Kerry") as a subcontractor to provide "Special Workout" services. *See* J. Ervin Decl. at ¶ 27; PPF at ¶ 107. Subsequently, Mr. Bill Hill, then a Director in HUD's Office of Multifamily Housing, direct-

ed Ervin to provide Kerry with access to databases concerning the AFS forms, but Ervin refused. *See* J. Ervin Decl. at ¶ 29; Pl.Ex. 3 at 263; PPF at ¶ 108. Hill then requested a "special extract" of data claiming that the purpose was to help HUD review certain troubled projects. *See* Hunt Decl. at ¶ 16; *see also* PPF at ¶ 109; Def.App. II at 114. Ervin provided the "special extract." *Id.* Unknown to Ervin, HUD provided this data to Kerry. *See* J. Ervin Decl. at ¶ 29; Pl.Ex. 28; PPF at ¶ 109.

#### 3. The Coopers & Lybrand And Hamilton Securities Request.

On September 21, 1994, two employees of Coopers & Lybrand ("C & L"), a subcontractor of Hamilton Securities ("Hamilton"), requested that Ervin provide C & L copies of the hard-copy AFS forms collected under the AFS Contract. *See* Oleniacz Decl. at ¶ 4; Pl.Ex. 3 at 295; PPF at ¶ 100. C & L stated that it needed the AFS forms in connection with work that it was performing under a different HUD contract and asked for a separate computer terminal and password to the EMFIS. *See* Oleniacz Decl. at ¶ 5; PPF at ¶ 101. Ervin agreed to provide hard copy of AFS forms to C & L, but refused to allow C & L access to the EMFIS or databases. *See* Oleniacz Decl. at 6; PPF at ¶ 102. On December 1, 1994, DAS Dunlap sent Ervin a letter requesting that Hamilton be provided with access to hard-copies of certain AFS data maintained in the EMFIS, but warned Ervin that: "Your failure to comply with the terms of this letter could result in termination of the Contract based on failure to comply with the [SOW.]" Pl.Ex. 26; *see also* PPF at ¶ 104; *but see* DR at ¶ 109 (HUD contends that the December 1, 1994 letter refers to a HUD contract other than the AFS Contract).

qualify as limited rights data or restricted computer software, if the Contractor desires to continue protection of such data, the Contractor shall withhold such data and not furnish them to the Government under this contract. As a condition to this withholding, the Contractor shall identify the data being withheld and furnish form, fit, and function data in lieu thereof. Limited rights data that are formatted as a computer data base for delivery to the Government are to

be treated as limited rights data and not restricted computer software." 48 C.F.R. § 52.227–14(g) (emphasis added).

19. Form HUD–93484 is the "Annual Financial Statement Completeness Checklist"; Form HUD–93485 is an "Annual Financial Statement Review Worksheet," and Form HUD–93486 is a "Computations of Surplus Cash, Distributions, and Residual Receipts." DPF at ¶ 22.

**4. Discussions Between Ervin And HUD Concerning Third Party Requests.**

On January 31, 1995, Ervin's General Counsel met with HUD's Deputy General Counsel to discuss third party requests that HUD received for access to the EMFIS and AFS databases. *See* Oleniacz Decl. at ¶ 8; PPF at ¶ 110; DR at ¶ 110. Ervin's General Counsel recalls that HUD agreed that Ervin could not sell data from AFS databases to third parties and that third parties would not obtain access to data in the AFS databases under FOIA "because the data was Ervin's and ... Ervin was under no obligation to provide it." Oleniacz Decl. at ¶ 8.

On February 8, 1995, John Ervin met with DAS Dunlap. *See* J. Ervin Decl. at ¶ 30; PPF at ¶ 111. Ervin claims that DAS Dunlap informed Ervin that HUD planned to hire an employee to create a database at its headquarters. *Id.* She also informed Ervin of a congressional request originated from NHP for AFS data maintained in the EMFIS. *Id.* Ervin told DAS Dunlap that "the Databases belonged to Ervin and thus could not be released." *Id.* According to John Ervin, however, DAS Dunlap stated that "she did not want HUD to own any of the data that Ervin had compiled because, in her view, if HUD owned the data, HUD would be required to release it to third parties under FOIA." *Id.* HUD asserts that the meeting was initiated because DAS Dunlap was concerned that Ervin was attempting to sell AFS data, which he was warned was "sensitive and proprietary to the property owners[.]" DR at ¶ 111.

On February 14, 1995, John Ervin sent an e-mail to GTM Miller to advise HUD that:

Throughout this contract, we have done, and continue to do, everything possible to ensure that whatever data needed by HUD is available to HUD. However, as you know the data that has been provided in the past (which was not a requirement of the contract) has only been provided with the mutual understanding that it not be released outside the Department and/or not used for any other purposes other than those which were intended.

As you know, our contract with the Department is for the purpose of reviewing financial statements. Although we have compiled certain data to allow us to do this more effectively, these compilations are not a requirement of the contract. The information was not requested by HUD, nor has HUD paid for us to complete it. Accordingly, the Department has no control over this information and is therefore unable to release it[.]

Additionally, our investment in the systems, approaches and methods used to compile this information represents an invaluable competitive advantage that is proprietary to Ervin and Associates. It is not appropriate [that] it be released to our competitors.

Pl.Ex. 29; *see also* J. Ervin Decl. at ¶ 31; PPF at ¶ 112.

Shortly thereafter, Ervin received a copy of a February 24, 1995 e-mail that GTM Miller sent to Kevin East, a Special Assistant to DAS Dunlap, wherein it was stated:

Kev: Remember the afs data you received from Ervin? ... We are experiencing some problems with people asking for data that we cannot give to them.... The only data available is through FOMNS, *e.g.,* the profit and loss and selected balance sheet items. Any other information, although Ervin may have it and it may belong to HUD, HUD has no data base to put it into and therefore, we don't have it. Ervin is under no obligation to provide data other than what is required under the contract.

Pl.Ex. 30; *see also* Pl.Ex. 7 at 83; J. Ervin Decl. at ¶ 32; PPF at ¶ 113.

In a deposition in a related case, GTM Miller was asked about this e-mail and testified that:

Mr. Ervin was under no obligation to provide us with that data. He did so willfully and gave it to us for a specific purpose. We shouldn't abuse that purpose by giving it to someone other than—to use it for other than the purpose we said we would.

Pl.Ex. 3 at 231; *see also* PPF at ¶ 114. She also recalled Ervin "objecting to HUD providing any other contractor with data[.]" Pl. Ex. 3 at 263; *see also* PPF at ¶ 114.

### G. In 1995, HUD Decided To Develop An In–House "Data Warehouse."

In early 1995, HUD decided to develop a database for multifamily housing that would include AFS data. *See* J. Ervin Decl. at ¶ 30, 34; PPF at ¶¶ 111, 115–116. This project was known within HUD as the "Data Warehouse." *Id.* HUD hired Ms. Kathy Palmer and assigned her to lead the project. *Id.* DAS Dunlap assigned Ms. Palmer and GTM Miller to evaluate all of HUD's multifamily computerized systems, known as the Information Strategy Plan ("ISP"). *See* Pl.Ex. 2 at 12, 152; Pl.Ex. 6 at 99–100; PPF at ¶¶ 116, 196–97. An ISP Report, issued in September 1995, evaluated Ervin's systems and, despite giving Ervin an excellent rating, recommended "replac[ing Ervin's systems] with a new, HUD-owned Asset Management system." Pl.Ex. 57; *see also* PPF at ¶ 198.

### 1. HUD Requested Ervin To Provide Data Downloads For The Data Warehouse.

On February 27, 1995, DAS Dunlap convened a meeting with various HUD officials including Mr. Kevin East, GTR Hannon, and Ms. Palmer. *See* Pl.Ex. 7 at 68–71; Pl.Ex. 32; PPF at ¶ 117. Hannon testified that: "[W]e had reported that Ervin contended that all data collected under the contract was theirs, and I was reporting to Helen [Dunlap] that on several occasions when that issue had come up we told them that the data was not theirs, it belongs to the government. And this was a report to Helen telling her that this was their contention[.]" Pl.Ex. 7 at 69; *see also* PPF at ¶ 117; DR at ¶ 117. At DAS Dunlap's direction, GTM Miller subsequently asked Ervin representatives to meet with Ms. Palmer. *See* Pl.Ex. 31 at 7; PPF at ¶ 118. DAS Dunlap instructed GTM Miller to direct Ervin to provide AFS data for the Data Warehouse. *See* Pl.Ex. 31 at 7, ¶ 98; PPF at ¶ 118.

On March 7, 1995, John Ervin and Brian Hunt met with Ms. Palmer at HUD headquarters, at which time Ervin was asked to provide a download "to populate and test HUD's Data Warehouse." J. Ervin Decl. at ¶ 34; *see also* Hunt Decl. at ¶ 17; Pl.Ex. 31 at 7; PPF at ¶ 119. Ms. Palmer represented that this request was made at the direction of DAS Dunlap. *Id.* Ms. Palmer also warned Ervin that if it failed to comply, its contracting relationship with HUD "would be at risk." *Id.* Ms. Palmer then provided Ervin with a list of data elements to be extracted from the EMFIS databases and loaded into the Data Warehouse. *See* Pl.Ex. 6 at 496–98; PPF at ¶ 120. HUD does not contest that Ervin provided HUD with "AFS data" acquired under the AFS Contract nor that the data in the Data Warehouse "would have been similar to the AFS data available from FOMNS." DR at ¶¶ 120, 123; *see also* Def. App. at 98, 134.

At first, Ervin did not provide the data download requested. *See* J. Ervin Decl. at ¶ 36; PPF at ¶ 121. DAS Dunlap then sent an e-mail to John Ervin complaining, "I don't know what we are waiting for but could you please coordinate with Bev [Miller]. Helen." Pl.Ex. 66; *see also* J. Ervin Decl. at ¶ 35; PPF at ¶ 121. On March 28, 1995, in an e-mail copied to John Ervin, GTM Miller advised Mr. East and GTR Hannon that:

> Ervin has agreed to do this work as the Assistant Secretary has deemed it necessary for you to do your analysis. This is not a part of the contract. This is something that Ervin is doing at Housing's request to assist you in your work.

Pl.Ex. 65; *see also* J. Ervin Decl. at ¶ 37; PPF at ¶ 122; DR at ¶ 122.

At the time, however, HUD had not provided Ervin with a Task Order 2 covering the first option year of the AFS Contract, which would authorize payment for the analysis of 1994 AFS forms. *See* J. Ervin Decl. at ¶¶ 36, 38; PPF at ¶ 125. Nevertheless, Ervin continued to perform work and by August 1995 had more than $2.4 million in outstanding invoices due from HUD, some of which were five months overdue. *Id.* HUD informed Ervin that it could not pay the outstanding invoices until Task Order No. 2 was issued obligating the necessary funds. *Id.* Ervin feared that if it did not provide the requested data downloads, DAS Dunlap would withhold the $2.4 million due or terminate the AFS Contract. *Id.*

On June 27, 1995, Ervin delivered a high capacity Syquest disk cartridge containing a download of 1993 AFS data to HUD for use to test the Data Warehouse. *See* Hunt Decl. at ¶ 18; PPF at ¶ 123; DR at ¶ 123. Through GTM Miller, Ms. Palmer subsequently requested that Ervin provide a download of additional data. *See* Hunt Decl. at ¶ 19; PPF at ¶ 124. Brian Hunt warned GTM Miller that this request was not a requirement of the AFS Contract and that this data should not be released outside of HUD. *Id.* Nevertheless, on July 20, 1995, Ervin delivered a Syquest disk containing this additional data to HUD. *See* Hunt Decl. at ¶ 19; PPF at ¶ 124. HUD takes the position that the AFS Contract required Ervin to provide "downloads of AFS Data." DR at ¶ 124; *see also* Def.App. at 1053–54.

## 2. Third Parties Were Provided With Access To The Data Warehouse.

According to John Ervin, GTM Miller and Ms. Palmer assured him that the·data downloads that Ervin provided HUD would only be used to test the Data Warehouse and would not be provided to Ervin's competitors. *See* J. Ervin Decl. at ¶ 39; PPF at ¶ 126. Ervin believed that it would not be competitively harmed by providing the data, so long as it was used only by HUD personnel. *Id.* But Ervin later learned that DAS Dunlap issued a memorandum to HUD personnel on June 28, 1995 establishing "[p]rocedures for providing databases to Hamilton," including the Data Warehouse. Pl.Ex. 34; *see also* PPF at ¶ 127. It was not until several months after Ervin provided data downloads to HUD that Ervin learned that several of its competitors had access to the Data Warehouse. *See* J. Ervin Decl. at ¶ 53; Pl.Ex. 28 at ¶ 61; PPF at ¶ 127.

Through an e-mail from GTM Miller dated October 27, 1995, Ervin learned that HUD had provided "Ervin's data" to Ernst & Young ("E & Y"). *See* Pl.Ex. 47; PPF at ¶ 171. John Ervin sent an e-mail to Al Sullivan, immediate supervisor of the GTR and GTM, objecting to HUD's actions: "Routinely giving the fruits of our investment to other contractors destroys our competitive advantage and threatens to put us out of business."

Pl.Ex. 47; *see also* DR at ¶ 171; PPF at ¶ 171.

HUD does not dispute that it gave E & Y access to AFS data housed in the Data Warehouse. *See* DR at ¶ 170; Pl.Ex. 10 at 103; Pl.Ex. 28 at 61; PPF at ¶ 170. In addition, HUD acknowledged that it provided AFS data stored in the Data Warehouse to Kerry and Hamilton. *See* DR at ¶ 173; Pl.Ex. 28 at 61; PPF at ¶ 173. Ervin alleges these contractors had access to the Data Warehouse during 1995 and 1996. *See* Ex. 48; PPF at ¶ 174; *but see* DR at ¶ 174 (HUD disputes the timeframe).

## 3. HUD Also Requested Ervin To Provide AFS Data To Enable HUD To Perform The LLR Analysis While Finalizing Task Order 2 Under The AFS Contract.

The Multifamily Loan Loss Reserve ("LLR") is an amount that HUD sets aside on its balance sheet each year for potential claims on mortgage assignments. *See* Pl.Ex. 6 at 84; DR at ¶ 128; PPF at ¶ 128. Prior to 1995, the LLR analysis had been performed by C & L under contract using a random sample of multifamily projects. *See* Pl.Ex. 10 at 20–21; PPF at ¶ 129. In 1994, Ervin voluntarily provided HUD with an extract of data from its databases to evaluate C & L's work. *See* Hunt Decl. at ¶ 20; PPF at ¶ 130.

Ms. Judy May was the HUD employee assigned to work on the LLR analysis for fiscal year 1994. *See* Pl.Ex. 10 at 8, 14–15, 18–21; PPF at ¶¶ 131–34; DR at ¶¶ 131–34. Ms. May identified several limitations in C & L's methodology and discussed with GTM Miller the need for a download of AFS data to perform the LLR analysis. *See* Pl.Ex. 10 at 23–24, 72; PPF at ¶¶ 135–36; DR at ¶¶ 135–36.

In an e-mail later forwarded to several HUD employees, the need for this data was described by GTM Miller as follows:

> The data for FOMNS is minimal! It is basically the HUD 92410, Statement of Profit and Loss, and a few select Balance Sheet items ( ... necessary to calculate surplus cash). Warehouse already is capable of receiving some of this; however, warehouse has many other data elements

not included in FOMNS. Also, keep in mind that the Comptroller's office (Judy May) will need many more data elements than FOMNS or warehouse in order to do Loan Loss Reserve. We should be sure that we know what exactly we want before we make an agreement with Ervin. Also, we need to know what we need to do [to] expand the warehouse to capture this data.

Pl.Ex. 80; *see also* PPF at ¶ 138.

In July 1995, at a meeting with GTM Miller and Brian Hunt, Ms. May requested a download from Ervin's database for the purpose of conducting the LLR analysis. *See* Hunt Decl. at ¶ 21; PPF at ¶ 139. Brian Hunt replied that the AFS Contract did not require Ervin to provide the data and that Ervin would need to be further compensated. *Id.* GTM Miller told Brian Hunt that she was under pressure from superiors to obtain the data and that a contract modification would take months. *See* Hunt Decl. at ¶ 22; PPF at ¶ 140. Moreover, Ms. May implied that if the download was withheld in order to seek a contract modification, Ervin's relationship with HUD would be "severely damaged." *Id.*

On July 6, 1995, CO Ammons–Barnett sent Ervin four unexecuted copies of the Task Order 2 to pay Ervin for the first option year under the AFS Contract. *See* Pl.Ex. 41; PPF at ¶ 147. Ervin claims that this was a "draft" that "added two new requirements: . . . financial data electronically to complete the 1994 Loan Loss Reserve calculations for the FHA Audit" and "information required for entry into the FOMNS and/or other [HUD] automated data systems." *Id.* HUD's position is that the SOW "always included the contractor providing HUD with its AFS data, for use as the Government saw fit[.]" DR at ¶ 147; *see also* Def.App.. at 1044, 1055.

Ervin objected to producing this information without additional compensation insisting that the "creation of the Database was not a requirement of the AFS Contract." J. Ervin Decl. at ¶ 46; *see also* PPF at ¶ 150. Brian Hunt also informed Contract Specialist Chabot of Ervin's objections. *See* Hunt Decl. at ¶ 24; PPF at ¶ 150.

On August 2, 1995, Brian Hunt sent GTM Miller revised Task Order 2 for review but deleted the requirement "to provide data for the LLR analysis or other HUD automated data systems." Hunt Decl. at ¶ 25; *compare* Pl.Ex. 41 *with* Def.App. at 1098–1120; *see also* PPF at ¶ 151.

In an August 3, 1995 e-mail to GTM Miller, Brian Hunt stated that:

Our intention is to initiate a task order that will, among other things, provide for Loan Loss Reserve Analysis, including the database that has been requested by Judy May. However, so as not to cause any inconvenience or delay for the Department, we will proceed in good faith with the development of the requested Database.

Pl.Ex. 37; *see also* PPF at ¶ 141.

In August 1995, Ervin was informed that Lar Gnessin would be replacing Ken Hannon as GTR and "it would be his job to renegotiate the AFS [c]ontract." Ervin Decl. at ¶ 50; *see also* PPF at ¶ 155. Ervin recalled that GTR Gnessin advised Ervin that DAS Dunlap assigned him to "fix" the AFS contract, which Ervin took to mean a contract modification would be forthcoming. *See* Ervin Decl. at ¶ 51; PPF at ¶ 156.

On August 18, 1995, GTM Miller forwarded an e-mail to Ervin, which included her response to an inquiry from Ms. May asking whether Ervin would be providing support services for preparation of the LLR analysis: "The Ervin contract does not call for providing support services. We may be able to work something out, but we will need more $$$ I think." Pl. Ex. 45; *see also* PPF at ¶ 157.

On August 21, 1995, a revised Task Order 2 was forwarded from HUD to Ervin for execution and was signed by Ervin that same day. *See* Def.App. 1098–1102; PPF at ¶ 152.

Ervin spent several weeks in August and September of 1995 assembling data for the LLR analysis in the requested format. *See* Hunt Decl. at ¶ 26; PPF at ¶ 158. On September 21, 1995, Ervin had a Syquest disk containing a copy of Ervin's database of 1993 and 1994 AFS data hand-delivered to GTM Miller. *See* Hunt Decl. at ¶ 27; PPF at

¶ 159. This time a cover letter was binder-clipped to the disk, however, which stated:

> In accordance with our previous discussions, attached is a Syquest removable disk cartridge which includes 1993 and 1994 Annual Financial Statement data for use in HUD's Risk Ranking process. As we have discussed, this type of support is not provided for in our contract, but we are releasing it to you in good faith so HUD is not delayed in meeting its critical objectives.
>
> [W]e are providing [the Database] on the condition that it not be made available directly or indirectly to any other contractor who is in competition with Ervin and Associates.

Pl.Ex. 46; *see also* Hunt Decl. at ¶ 27; PPF at ¶ 159.

HUD never responded to Ervin's letter. *See* Hunt Decl. at ¶ 28; PPF at ¶ 161. Thereafter, Ms. May downloaded data from the Syquest disk into her office computer at HUD. *See* Pl.Ex. 10 at 144; PPF at ¶ 162. She then allegedly transferred the data to a disk that was provided to the Data Warehouse. *Compare* PPF at ¶ 162 *with* DR at ¶ 162 (disputing that May transferred this data from her computer to the Data Warehouse). Ms. May then made the AFS data available to HUD contractors, but always asked GTM Miller's permission before doing so. *See* Pl. Ex 10 at 90–91; PPF at ¶ 163.

On September 27, 1995, GTM Miller forwarded Ervin an e-mail from Ms. May that reported:

> I received two files from Ervin— each with approximately 15,000 records and 13,000,-000 bytes of data.... Much of the data that I have received from Ervin is already available through the Warehouse, and the Warehouse provides a wide array of support to the user. Kathy Palmer is eager to develop and make available whatever queries or reports that users need. Kathy has also volunteered to respond to all requests for data from within and outside of HUD[.]

Pl.Ex. 42; PPF at ¶ 164; DR at ¶ 164.

This e-mail "caused Ervin to suspect that Judy May was ignoring the restrictions in Ervin's September 21, 1995 letter." Hunt Decl. at ¶ 29; *see also* PPF at ¶ 165. On September 27, 1995, Brian Hunt responded by e-mail to GTM Miller:

> Bev: I just wanted to followup with you and to ensure that you received the letter that I sent to you regarding the use of the data (it was delivered with actual data).

Pl.Ex. 42; *see also* Hunt Decl. at ¶ 29; PPF at ¶ 165; DR at ¶ 165.

GTM Miller advised Brian Hunt that she forwarded the e-mail both to Ms. May and her immediate supervisor, William Hill. *See* Hunt Decl. at ¶ 30; PPF at ¶ 166. Ms. May later testified that a HUD employee brought the Syquest disk to her and that "[a] letter was transmitted with [the] data that attempted to put conditions on it. I personally never understood the letter, and I left the matter to Bev [Miller] to handle." Pl.Ex. 10 at 81–84; *see also* PPF at ¶ 167.

Ervin claims that HUD never informed Ervin that it considered the databases to be HUD's and "therefore was not bound by Ervin's restrictions." Hunt Decl. at ¶ 31; *see also* Pl.Ex. at 5 at 608, 612; PPF at ¶ 168.

On September 27, 1995, six days after Ervin provided the LLR download, HUD paid over $2.1 million of Ervin's outstanding AFS Contract invoices, which were between three and six months past due. *Compare* J. Ervin Decl. at ¶ 49; PPF at ¶ 168 *with* DR at ¶¶ 105–06, 168 (objecting to Ervin's attempt to link the LLR download to AFS Contract payments).

**H. On November 25, 1995, Ervin Registered "Certain Aspects Of Its System" With The Copyright Office And The Dispute With HUD Escalated With Ervin Filing Two Lawsuits On June 5, 1996.**

Several months after July 1995, Ervin learned that HUD provided data downloads to E & Y, and Ervin refused to provide any additional data from "its Database" without a contract modification or new Task Order. *See* J. Ervin Decl. at ¶ 53; Pl.Ex. 28 at ¶ 61; PPF at ¶¶ 127, 175; DR at ¶ 175. On November 20, 1995, Ervin filed a copyright registration on "certain aspects of its system."

PPF at ¶ 17. Ervin states that the "copyrighted features included the *particular manner used to process* individual AFSs . . . and the programs used for running competitive queries in multiple projects and assessing the performance of these projects." J. Ervin Decl. at ¶ 14. Ervin states that it applied for the copyright because it suspected that HUD was attempting to duplicate its computer system. *See* J. Ervin Decl. at ¶ 14; PPF at ¶ 18.

In an e-mail to DAS Dunlap on November 30, 1995, GTR Gnessin reported:

I spoke with John Ervin last evening about him giving us the Warehouse download. He said that he would only [sic] if we gave him a written statement that the data would not be distributed to other HUD contractors . . . .

After listening to him at length (very much at length), I feel that he has a legitimate gripe, which we need to discuss.

Pl.Ex. 81; PPF at ¶ 182; *see also* DR at ¶ 182 (explaining that GTR Gnessin was not familiar with the terms of the AFS Contract). According to HUD, "both Mr. Gnessin and Ms. Miller were feeling pressure to quickly take action, because they were trying to avoid the problems that would result from the agency not having the use of its financial statement data." DR at ¶ 182.

On November 30, 1995, GTR Gnessin informed John Ervin that Gnessin attended a meeting with DAS Dunlap and HUD's Deputy General Counsel and "the consensus was that HUD has been unreasonable toward Ervin and they realize Ervin should be compensated for its extra work and that just moving money around among CLINs would not be sufficient." J. Ervin Decl. at ¶ 55; *see also* PPF at ¶ 183. Ervin and GTR Gnessin continued discussions until the end of February 1996, but HUD was unwilling to allocate additional money for "past or future data downloads." PPF at ¶ 187; DR at ¶ 187.

In an internal HUD e-mail, dated March 5, 1996, GTR Gnessin reported:

Folks, I just spoke to Rich Marchese and John Opitz [counsel for HUD's Office of Procurement and Contracts] concerning our data rights. They have done an in

depth review of the [AFS contract]. Oy vey! We have no rights to any of the electronic data he has keyed outside of what is specifically stated in the contract (FOMNS). In fact, Ervin should be asking for a contract mod and lots of money for all the "extra" data and reports that we have received.

Pl.Ex. 53; *but see* DR at ¶ 188 (disputing the significance of GTR Gnessin's email: "[d]isagree that there is any evidence to suggest that Mr. Marchese or Mr. Opitz actually made the underlying statements. Also disagree that this position as to the contract is supported by the evidence. . . . Many officials at HUD had previously made it clear they did not share this position—and had even advised Ervin of the fact.").

In March 1996, GTR Gnessin prepared a briefing on the AFS Contract which concluded that: "John Opitz and Rich Marchese, OGC have reviewed the contract in detail and counseled that HUD has [sic] does not have rights to data other than the deliverable FOMNS data that was requested in the contract." Pl.Ex. 54; *but see* DR at ¶ 190 (HUD agrees that GTR Gnessin made this statement, but argues that the "contract establishes the parties' contract rights.").

In early March 1996, GTR Gnessin presented Ervin with Task Order 3 for 1995 AFS forms that included a specific requirement to provide past and future data downloads for Data Warehouse, LLR, and other downloads. *See* J. Ervin Decl. at ¶ 60; PPF at ¶ 191. As with Task Order No. 2, Ervin did not agree to these terms. *Id.* In a letter of March 12, 1996, Al Sullivan (the immediate supervisor of the GTR and GTM) wrote to John Ervin advising him that:

I have instructed Lar Gnessin, the GTR, to write our task order to review FY–1995 AFS in accordance with your current statement of work. The Task Order is currently being processed and should be out to you shortly. With your support, I would also like to move ahead with our discussions concerning contract changes while HUD continues to process the documentation necessary to implement these changes.

Pl.Ex. 76; *see also* PPF at ¶ 192; DR at ¶ 192.

On June 5, 1996, Ervin filed an action in the United States District Court for the District of Columbia, the events leading up to which GTR Gnessin summarized as follows:

He [Sullivan] sent J. Ervin a proposed new statement of work which J. Ervin countered. J. Ervin's counter proposal did not include a price on the data. Ultimately management refused to pay J. Ervin because HUD considered the data created to be HUD's. He could never get a legal opinion from OGC to determine who the data belonged to. When J. Ervin realized that the negotiations with HUD were not going anywhere, he (J. Ervin) filed suit.

Pl.Ex. 55; *see also* PPF at ¶ 194; DR at ¶ 194.

HUD terminated the AFS Contract in February 1997. *See Ervin & Assocs. v. United States*, 44 Fed.Cl. 646, 648 (1999). In July 1997, OMH issued a System Requirements Document ("SRD") that outlined its requirements for the creation of a system that automates the AFS submission and review process including "the collection, review, and initial analysis of annual financial statement data for multifamily residential projects[.]" Pl.Ex. 59 at 2–9; *see also* PPF at ¶ 203; DR at ¶ 203. According to Ervin, the SRD project attempted to replicate Ervin's system for analyzing the AFS forms. *See* Pl.Ex. 59; Hunt Decl. at ¶¶ 33–37; PPF at ¶¶ 204–12. The SRD project resulted in the creation of new HUD systems that were used in 2003 to review and analyze AFS forms and generate automated letters to project owners. *See* Pl.Ex. 2 at 133–34; Pl.Ex. 6 at 162–63; PPF at ¶ 213; DR at ¶ 213.

## I. Ervin's Parallel Dispute With HUD Over The Conditions Notebook.

Based on its experience in the "affordable housing industry," Ervin claims to have identified and summarized 437 "conditions" that typically arise during review of an AFS form, such as missing or inaccurate information, "equity skimming," and indications of certain risks to HUD. *See* S. Ervin Decl. at ¶ 5; PPF at ¶ 215. The record reflects that Ervin wrote computer programs automatically to test the interrelationships of the data elements for each AFS. *See* Hunt Decl. at ¶ 5; PPF at ¶ 9. These tests produced "findings" or "conditions" indicating whether some further action was required with respect to an AFS form, *i.e.*, either a follow-up letter to the project owner or a more detailed manual review by a professional auditor. *See* Hunt Decl. at ¶¶ 5–6; PPF at ¶ 10. Ervin assembled a compilation of these conditions into a three-ring binder ("Conditions Notebook"). *See* Pl.Ex. 64; S. Ervin Decl. at ¶ 8; PPF at ¶ 218.

After being awarded the AFS Contract in February 1994, Ervin "produced" three versions of the Conditions Notebook. S. Ervin Decl. at ¶ 14; *see also* PPF at ¶ 224. In April 1994, Ervin gave GTR Hannon a copy of the Conditions Notebook and solicited his comments. *See* S. Ervin Decl. at ¶ 14; DR at ¶¶ 218–24. GTR Hannon sought input from other HUD personnel and returned a marked-up copy of the Conditions Notebook to Ervin. *Id.* Some, but not all, of HUD's comments were included in the next version of the Conditions Notebook. *Id.*

The AFS Contract required Ervin to make a four-hour presentation to each HUD field office after Ervin completed half the reviews for each office in the first year of the AFS Contract. *See* Def.App. at 1054–55; S. Ervin Decl. at ¶ 15; PPF at ¶ 225; DR at ¶ 225. At these presentations, Ervin discussed various aspects of the Conditions Notebook and may have distributed pages from it, but Ervin recalls that it was never distributed in its entirety. *See* S. Ervin Decl. at ¶ 15; PPF at ¶ 26. According to an internal HUD e-mail, Ervin's presentations were regarded as "excellent." Pl.Ex. 77; *see also* S. Ervin Decl. at ¶ 15; PPF at ¶ 227. HUD claims that Ervin distributed the Conditions Notebook shortly after the training sessions. *See* DR at ¶ 226, citing Def.App. 1529 (a draft letter regarding training that informs field offices they will receive a packet of information including the Conditions Notebook). It is undisputed that in 1994 and 1995, Ervin provided at least one copy of the Conditions Notebook to each field office and HUD headquarters. *See* S. Ervin Decl. at ¶ 16; PPF at ¶ 228; DR at ¶ 228. Ervin

"hoped this document would help field office personnel understand the conditions in the draft letters[.]" *Id.* After completing most of the AFS reviews for a given year, Ervin would update the Conditions Notebook based on "lessons learned" during the reviews. Ervin Decl. at ¶ 13; *see also* PPF at ¶ 223; DR at ¶ 223.

On November 20, 1995, Ervin received a copyright on the July 17, 1995 version of the Conditions Notebook, which was distributed to HUD with the notice: "Copyright 1994, 1995 By Ervin and Associates, Incorporated." S. Ervin Decl. at ¶ 17; Def.App. at 1652; *see also* PPF at ¶ 230; PPF at ¶ 17 ("on November 20, 1995 Ervin obtained a copyright [TXU 708–754] . . . on certain aspects of its system. . . . The copyright features included the particular manner used to process individual AFS. . . and the programs used for running comparative queries on multiple projects and assessing the performance of these projects."). Ervin also applied and received a copyright [TXU 740–716] on the May 29, 1996 version of the Conditions Notebook. *See* Pl.Ex. 64; S. Ervin Decl. at ¶ 18; PPF at ¶ 231. This is the version of the Conditions Notebook that is subject to Count 6 and 7 of the Complaint in this action. *See* PPF at ¶ 231 n.14. That same day, Ervin's counsel provided a copy of this version of the Conditions Notebook to Ms. Laura Atzmiller, the most recent GTM, together with a cover letter stating: "Attached is the Conditions Notebook for your review. Please note that this Conditions Notebook is being provided to you with all rights reserved and subject to copyright registration number TX 4–153–788 and pending application(s)." S. Ervin Decl. at ¶ 18. The Notebook also contained this legend:

> ALL RIGHTS RESERVED, Copyright 1994, 1995, 1996 By Ervin and Associates, Incorporated. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recorded, or otherwise without the prior written permission of Ervin and Associates, Incorporated.

*Id.* On June 12, 1996, Ms. Atzmiller called Brian Hunt to report: "I am being bombard-ed with questions from the field offices regarding the copyright clause that is printed on the conditions notebook." S. Ervin Decl. at ¶¶ 19–21; *see also* PPF at ¶ 232; DR at ¶ 232.

In a June 13, 1996 letter, Ervin offered to negotiate a copyright license with HUD to resolve a copyright infringement claim that was part of the lawsuit Ervin filed on June 5, 1996 in the United States District Court for the District of Columbia. *See* S. Ervin Decl. at ¶ 19; Pl.Ex. 69; PPF at ¶ 233. In a July 17, 1996 memorandum, the Director of Multifamily Asset Management and Disposition advised all HUD Multifamily Housing Directors of the dispute with Ervin and instructed them that "[r]elease or use of the conditions notebook outside of HUD field offices is not approved." Pl.Ex. 70; *see also* PPF at ¶ 234; DR at ¶ 234.

Ervin believed, however, that HUD field office personnel still were using the Conditions Notebook for internal reviews not covered by the AFS Contract. *See* S. Ervin Decl. at ¶ 20; PPF at ¶ 235. Therefore, on November 15, 1996, Ervin advised the GTM and CO that:

> As you know you were provided with a copy of our copyrighted proprietary conditions notebook for exclusive use in processing projects for which we conducted a professional review. You are not authorized and have never been authorized to utilize the notebook for any other purpose, including conducting your own reviews of non-professionally reviewed financial statements.

Pl.Ex. 71; *see also* S. Ervin Decl. at ¶ 20; PPF at ¶ 236; DR at ¶ 236. This letter also demanded that HUD return the Conditions Notebook to Ervin. *Id.*

On November 19, 1996, the GTM issued the following instruction to HUD staff members: "Do not answer the 11/15/96 letter from Ervin and Associates. Don't send Ervin anything." Pl.Ex. 72; *see* PPF at ¶ 237; DR at ¶ 237. On December 17, 1996, Ervin advised HUD that:

> We have previously advised HUD that information included in the Conditions Notebooks we developed is the property of Ervin and Associates. As such, this infor-

mation can only be used without specific permission, which has not been granted. We have previously requested that HUD return all Conditions Notebooks to us.

Ervin and Associates provided HUD with Conditions Notebooks as a convenience to enable the efficient processing of letters for approximately 30% of the portfolio that Ervin generated as part of its financial statement review contract. The Notebooks are copyrighted material belonging to Ervin, and were not required by Ervin's financial statement contract. Given that HUD has unlawfully reprocured financial statement processing services and is unwilling to discuss a licensing agreement with us, it is improper for HUD to retain Ervin's Conditions Notebooks or to use those Notebooks for any purpose. Therefore, we renew our demand that HUD immediately return all of the Conditions Notebooks, as well as all copies of such Notebooks, to Ervin and Associates.

Pl.Ex. 73; *see also* PPF at ¶ 238; DR at ¶ 238.

On December 26, 1996, Ervin informed the CO that its price for a limited license to use the Conditions Notebook would be $595 per financial statement reviewed by any government agency. *See* Pl.Ex. 74; PPF at ¶ 239; DR at ¶ 239. Ervin alleges that at least eleven HUD field offices, in the course of preparing letters to project owners, copied language verbatim from the Conditions Notebook. *See* S. Ervin Decl. at ¶¶ 23–24; PPF at ¶ 240.

There is significant dispute between the parties about the origin of the "conditions." Ervin contends that compilations of these conditions had been used as early as 1990 as a reference to help Ervin employees to review AFS data and to "perform the HUD [1993] Asset Management Contract." S. Ervin Decl. at ¶ 7; *see also* PPF at ¶ 217; J. Ervin Decl. at ¶ 4; Def.App. at 588–89 (discussing Ervin's use of AFS forms to perform under the 1990 Co–Insurance Contract). Moreover, Ervin maintains that the production of the Conditions Notebook was not a "deliverable" required by the AFS Contract nor any of Ervin's proposals. *See* S. Ervin Decl. at ¶ 11; PPF at ¶¶ 221–29.

HUD explains that the logic of the AFS forms gave rise to certain conditions while others were first identified by HUD or the result of corrective action taken by HUD. *See* Def.App. 256–314, 375–400, 657–64, 1052, 1544–85, 1729–2402; DR at ¶¶ 9–10; Def. App. II at 26–34. HUD also states that "[t]he evidence indicates that the 437 conditions were summarized under the AFS Contract and were derived from the conditions identified in the HUD Handbooks." DR at ¶ 215; *see also* DR at ¶¶ 216–17. HUD admits that the follow-up letters included language similar or identical to that used in the Conditions Notebook, but contends that HUD had been drafting these letters "years before Ervin was ever involved." DR at ¶ 240; *see also* Def.App. 529–34 and DR at ¶ 229 (asserting the Conditions Notebook was a training material required under the AFS Contract).

## PROCEDURAL BACKGROUND

### A. Related District Court Litigation And October 5, 2000 Settlement Resolving Certain Of Ervin's Claims.

On June 5, 1996, Ervin filed two related suits in the United States District Court for the District of Columbia. *See Ervin & Assocs., Inc. v. Dunlap*, Civil Action No. 96–1253 (D.D.C.) (alleging HUD retaliation for Ervin's exposure of alleged fraud and corruption in contracting activities in violation of the First and Fifth Amendments of the United States Constitution; the Administrative Procedure Act; and the Freedom of Information Act); and *Ervin & Assocs., Inc. v. Cisneros*, Civil Action No. 96–02164 (D.D.C.).

On February 13, 1997, the Honorable William Benson Bryant, ruling from the bench, dismissed most of the Government's pending motion to dismiss in the *Dunlap* suit. *See* J. Ervin Decl. at ¶ 64; Pl.Ex. 1 at 655–64; PPF at ¶ 243. Later that day, HUD terminated Ervin's AFS Contract for default. *Id.* The United States District Court filed an opinion on February 14, 1997 confirming denial of the Government's motion to dismiss in part. *See Ervin & Assocs. v. Dunlap*, 33 F.Supp.2d 1, 7 (D.D.C.1997) ("[T]he chronology of events alleged demonstrates a gradual but

complete and unexplained termination of Ervin's relationship with HUD. Ervin provides ample support for his conclusion that the termination of his contracting relationship with the agency was deliberate, and retaliation for his criticism of procurement and contracting decisions.").

After several years of litigation, on October 5, 2000, HUD agreed to pay Ervin $2 million to settle both of these suits and two other related actions. *See* Pl.Ex. 61 at ¶ 2 (citing *Ervin & Assocs., Inc. v. Dep't of Housing and Urban Dev.,* Civil Action No. 99–0857 (D.D.C.); *Ervin & Assocs. Inc. v. Greer,* Civil Action No. 99–1377 (D.D.C.)); *see also* Transcript of Sept. 25, 2001 Status Conference in *Ervin v. United States,* Fed. Cl. No. 01–153C (The Honorable John P. Wiese) at 8; Transcript of June 27, 2002 Hearing (The Honorable John P. Wiese) at 11; PPF at ¶ 224; DR at ¶ 224. In addition, HUD agreed to convert the termination for default to a termination for convenience. *Id.* Other claims arising out of the termination and/or nonrenewal of the AFS Contract also were included in the settlement. *Id.* The parties, however, agreed to exclude "the three claims submitted to HUD on February 23, 2000, captioned the Data Download Claim, the Conditions Notebook Claim, and the System Claim." Pl.Ex. 61 at ¶ 10.

Ervin, in addition, was specifically precluded from:

offering any evidence of any act, omission, decision, statement, conduct, or event that occurred prior to the date of this [settlement] agreement for the purpose of proving intent, causation, or any other element of any claim for relief, or cause of action against the [United States] for retaliation for speech protected by the First Amendment, deprivation of liberty or property without due process, denial of equal protection, or discrimination.... [However,] Ervin may, to the extent previously asserted in the pending HUD claims, continue to

seek just compensation for the alleged taking of its intellectual property.

*Id.* at ¶ 14(a).

Ervin also was precluded from asserting that:

the [United States] ... sought or threatened to retaliate against, discriminate against, or otherwise harass Ervin for any reason[.]

*Id.* at ¶ 14(b).

Finally, Ervin was precluded from offering:

any evidence of any act, omission, decision, statement, conduct, or event that occurred prior to the date of this [settlement] agreement for the purpose of proving duress with respect to any claim, cause of action, or allegation. Ervin may adduce evidence in an attempt to establish the conversations and financial circumstances that Ervin contends constituted duress in paragraphs 18, 19, 20, and 22 of the Data Download Claim. Ervin shall not otherwise attempt to adduce any evidence of alleged retaliation or threats of retaliation; similarly, Ervin shall not attempt to adduce any evidence of retaliatory motive with respect to the circumstances allegedly giving rise to "financial duress" in paragraph 19 of the Data Download Claim.

*Id.* at ¶ 14(c).

On June 6, 1996, Ervin also filed an action against Hamilton and others under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–31. *See United States ex rel. v. Hamilton Securities Group,* No. 96–1258 (D.D.C.);[20] *see also* J. Ervin Decl. at ¶ 62; Pl.Ex. 61 at ¶ 2; PPF at ¶ 241. As of this date, Ervin's *qui tam* action is still pending as is a countersuit by Hamilton. *Hamilton Securities Group v. Ervin and Assocs., Inc.,* Civil Action No. 99–CV–01698 (D.D.C.); *see also* J. Ervin Decl. at ¶ 62; Pl.Ex. 61; PPF at ¶ 245.

20. In July 1996, the Office of the United States Attorney for the District of Columbia requested the assistance of the HUD Office of Inspector General to investigate the allegations in the *qui tam* complaint and related actions. In February 1997, certain of these materials were incorporated into a HUD investigative file. *See Hamilton Securities Group Inc. v. Dep't of Housing and Urban Dev.,* 106 F.Supp.2d 23, 24 (D.D.C.2000).

**B. On December 1, 2000, The Contracting Officer Issued Decisions Addressing Ervin's "Data Download Claims," "System Claims," and "Conditions Notebook Claim."**

In August 1996, Ervin filed a complaint in the United States Court of Federal Claims; however, that complaint was dismissed without prejudice for failure to comply with the jurisdictional requirements of the Contracts Disputes Act, 41 U.S.C. §§ 601–13 (1994) ("CDA"). *See Ervin & Assocs., Inc. v. United States,* 44 Fed.Cl. 646, 653 (1999). Ervin's claims were then filed with the Office of the Chief Procurement Officer in February 2000. *See* Def.App. at 3104–31. A CO from that Office reviewed Ervin's claims and issued a decision in three letters, dated December 1, 2000, addressing Ervin's "Data Download Claims," "System Claims," and "Conditions Notebook Claim." *See* Def.App. at 3104–31.

Ervin's "Data Download Claim" was denied because:

> [T]he contractor was contractually required to deliver what was offered in the proposal, including the data downloads which are claimed to be outside the terms of the contract. [Ervin's] contract proposal did not assert that any of the deliverables offered would be delivered with other than unlimited rights. In addition, the data rights clause of [the] contract the parties entered into provided HUD with unlimited rights in the data.

*Id.* at 3111.

Moreover, because the data at issue was "first produced" in performance of the contract, pursuant to FAR § 52.227–14(b)(1), the CO found that it did not qualify either as "limited rights" data or "restricted computer software" and, in any event, was not delivered in compliance with required notice provisions. *See* Def.App. at 3111–13. Regarding Ervin's "constructive change" argument, the CO found that the AFS Contract data was delivered as required, there was no change in the AFS Contract, and Ervin was required to notify the AFS Contract CO of any change, but failed to do so. *Id.* at 3113. The CO's decision did not address Ervin's takings claim as to the "data downloads." *Id.*

The CO also denied Ervin's "Systems Claim," primarily because there was no evidence that HUD improperly copied the logic of the tasks performed by the EMFIS system and Ervin did not allege that HUD copied any source code. *See* Def.App. at 3119–20. In addition, the CO found that Ervin did not properly avail itself of 48 C.F.R. § 52.227–14(f), which provides the "limited circumstances under which a contractor may seek permission to have . . . copyright notices placed on qualifying data." *Id.* at 3120. The CO stated that it did not have jurisdiction over Ervin's copyright infringement and takings claims, however, to the extent there was jurisdiction over these claims, they were denied. *Id.* at 3115–21.

Finally, Ervin's "Conditions Notebook" claims were denied. *See* Def.App. at 3129–31. Addressing Ervin's breach-of-contract and copyright infringement claims regarding the "Conditions Notebook," the CO concluded:

> [T]he data rights clause of the contract, together with the remaining terms of the contract, establish[es] the respective rights of the parties in the Conditions Notebook. The data rights clause also establishes both the ability of [Ervin] to seek copyright (with the written permission of the Contracting Officer), and the respective rights of the parties with regard to copyright. Thus, the express contract defines the parties' rights with regard to copyright and with regard to the Conditions Notebook. Under these circumstances, I find that HUD did not enter into an implied-in-fact contract with [Ervin] covering the Conditions Notebook. In addition, as I find that HUD had unlimited rights in the Conditions Notebook based upon the AFS Contract, it would appear that [Ervin] does not have a basis for alleging that HUD infringed whatever copyright [Ervin] obtained in the Conditions Notebook. However, my authority does not extend to determining whether there has been a copyright infringement under 28 U.S.C. 1498(b).

*Id.* at 3129.

In conclusion . . . [t]he evidence indicates that the conditions notebook qualifies un-

der the data rights clause, FAR 52.227–14(b), as data first produced in performance of the contract, as well as data delivered under this contract, with unlimited rights. In addition, the evidence supports a finding that HUD and HUD employees played a significant role in the creation and development of the Conditions Notebook.

*Id.* at 3131.

### C. On March 19, 2001, Ervin Filed A Second Complaint In The United States Court of Federal Claims.

On March 19, 2001, Ervin filed a second complaint in the United States Court of Federal Claims. Count 1 (Paragraphs 1–49) alleges a breach of contract because HUD provided Ervin's competitors with AFS data downloads. Count 2 (Paragraphs 1–52) seeks just compensation for the taking of the AFS data downloads, pursuant to the Fifth Amendment of the United States Constitution. Count 3 (Paragraphs 1–55) alleges that delivery of the data downloads constituted a constructive change to the AFS Contract. Count 4 (Paragraphs 1–59) alleges that HUD is liable for copyright infringement under 28 U.S.C. § 1498(b) for its "duplication" of the EMFIS. Count 5 (Paragraphs 1–62) seeks just compensation for the taking of components of the EMFIS. Count 6 (Paragraphs 1–65) alleges a breach of contract caused by HUD's use of the Conditions Notebook without paying Ervin additional compensation. Count 7 (Paragraphs 1–69) alleges copyright infringement by HUD for its use of the 1996 version of the Conditions Notebook.

On February 4, 2003, the Government filed a Motion for Summary Judgment, together with five volumes of appendices. *See* Def. App. at 1–3138. On April 15, 2003, Ervin filed a Cross–Motion for Partial Summary Judgment, and Opposition to Defendant's Motion, together with two volumes of appendices. *See* Pl.Ex. 1–63. On July 29, 2003, the Government filed a Reply to Plaintiff's Opposition and Opposition to Plaintiff's Cross–Motion, with an additional 22 pages of appendices. On August 4, 2003, the Government filed an additional appendix in response to plaintiff's Proposed Findings of Uncontroverted Facts, consisting of 220 pages. On August 15, 2003, the Honorable John P. Wiese transferred this case to the undersigned judge. On October 8, 2003, Ervin filed a Reply to the Government's Opposition.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Instead, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States*, 201 F.3d 1375, 1377 (Fed.Cir.2000).

Under the CDA, a contractor must exhaust its administrative remedies by first seeking and obtaining a formal decision of the CO before the United States Court of Federal Claims has jurisdiction to hear a breach of contract claim. *See* 41 U.S.C. § 605(a).

### B. Standard For Decision.

#### 1. Review Of The Contracting Officer's Decision.

The CO's decision, although a prerequisite for the court's exercise of jurisdiction, nevertheless is entitled to no deference, and the contractor retains the burden of proof as to liability, causation, and injury. As the United States Court of Appeals for the Federal Circuit held in *Wilner v. United States*, 24 F.3d 1397 (Fed.Cir.1994):

> As far as the contracting officer's decision is concerned, the CDA states that [s]pecific findings of fact are not required, but, if

made, shall not be binding in any subsequent proceeding.... The CDA further provides that, after a contracting officer renders a decision upon a claim, a contractor may bring an action directly on the claim in the Court of Federal Claims, 41 U.S.C. § 609(a)(1). In the Court of Federal Claims, the action proceeds *"de novo* in accordance with the rules of the ... court." 41 U.S.C. § 609(a)(3)[.]

The plain language of the CDA and our decision in *Assurance* [*Co. v. United States*, 813 F.2d 1202 (Fed.Cir.1987)] make it clear that when suit is brought following a contracting officer's decision, the findings of fact in that decision are not binding upon the parties and are not entitled to any deference. The contractor has the burden of proving the fundamental facts of liability and damages *de novo. See Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991) (to receive an equitable adjustment from the Government, a contractor must show three necessary elements-liability, causation, and resultant injury.).

*Id.* at 1401–02.

**2. Summary Judgment.**

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See* CFCR 56(c); *see also Winstar Corp. v. United States*, 64 F.3d 1531, 1539 (Fed.Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of *"some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63.

The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In addition, all presumptions and inferences must be resolved in favor of the non-moving party. *See Jay v. Secretary of Dept. of Health and Human Servs.*, 998 F.2d 979 (Fed.Cir.1993).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *Id.* (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). The court must evaluate each party's motion on its own merits. *Id.*

**C. Issues Raised By The Parties For Summary Judgment.**

In moving to dismiss Counts I, 3–4 and 6–7, the Government asserts, as a matter of

law, that: the data downloads Ervin provided HUD were subject to and required by the AFS Contract, which was not constructively changed nor supplanted by an implied-in-fact contract (*see* Def. Mot. S.J. at 10–21); the "Rights In Data—General" Clause of the AFS Contract provided HUD with "unlimited rights" (*id.* at 21–26); there was no improper copying of the EMFIS or components thereof, and therefore no copyright infringement (*id.* at 26–37); and Ervin's Conditions Notebooks were produced pursuant to the AFS Contract, giving HUD unlimited rights under the "Rights In Data–General" Clause. *Id.* at 37–46.

On April 11, 2003, Ervin filed a cross-motion for summary judgment on Counts 1–3 and 6–7 of its March 19, 2001 Complaint. Count 1 alleges HUD breached a contract (other than the AFS Contract) not to share "Ervin's database with other competitors." Pl. Cross–Mot. S.J. at 17–20. Substituent in this argument are Ervin's related contentions that the CO "was alerted" to HUD's "extra-contractual request for downloads" and that Ervin had the right to rely on its communications with a variety of HUD employees about Ervin's concerns about confidentiality. *Id.* at 20–26. Ervin further asserts that the "Rights In Data–General" Clause is of no legal effect in this case because "Ervin's databases were not produced in the performance" of the AFS Contract (*id.* at 31–35) or at most were "limited rights" data (*id.* at 35–37), or alternatively that HUD is estopped from relying on that Clause. *Id.* at 26–31.

Ervin also seeks summary judgment on Count 2, which alleges that HUD's request for "Ervin's data downloads" was an unlawful taking in violation of the Just Compensation Clause of the Fifth Amendment of the United States Constitution. *Id.* at 37–38. Ervin's basis for summary judgment as to Count 3 is that HUD's request for "extra contractual" data downloads was a constructive change to the AFS Contract. *Id.* at 38–40.

In addition, Ervin seeks summary judgment as to Count 6, which alleges a breach of contract (other than the AFS Contract), regarding HUD's use of the Conditions Note-book without paying additional compensation to Ervin. *Id.* at 49–51. Finally, Ervin seeks summary judgment as to Count 7, which alleges a violation of the copyright in the May 29, 1996 version of Ervin's Conditions Notebook. *Id.* at 40–48.

In sum, HUD and Ervin have moved for summary judgment on the same or substantially the same issues that arise from the allegations in Counts 1, 3, 6, and 7. In addition, Ervin seeks summary judgment as to Count 2 and HUD seeks summary judgment as to Count 4.

1. **The Data Downloads Ervin Provided HUD Were Required By The AFS Contract.**

█ HUD claims, as a matter of law, that the data downloads Ervin provided HUD were required by the AFS Contract. *See* Def. Mot. S.J. at 10–21. Ervin claims the AFS Contract did not require the production or delivery of data downloads. *See* Pl. Cross–Mot. S.J. at 15–16.

The record reflects that Ervin provided HUD with four or five separate data downloads during the time the AFS Contract was in effect. In 1994, Ervin voluntarily provided HUD with an extract "representing a sample of HUD projects, to allow HUD to validate the work of its Loan Loss Reserve contractor." Hunt Decl. at ¶ 20; PPF at ¶ 30. HUD asserts that Ervin also delivered AFS Data to HUD "by June 1995," without "attempting to place any restriction on HUD's use." DR at ¶ 124. On June 27, 1995, Ervin provided HUD with a "Syquest" disk containing a download of AFS data that HUD requested to test its Data Warehouse. *See* Hunt Decl. at ¶ 18; PPF at ¶ 123; DR at ¶ 123. On July 20, 1995, Ervin delivered another Syquest disk to HUD. *See* Hunt Decl. at ¶ 19; PPF at ¶ 124; Def.App. II at 153. On or about September 21, 1995, Ervin also provided GTM Miller with a Syquest disk containing a copy of 1993 and 1994 AFS data, which then was inputted into the Data Warehouse and provided by HUD to Ervin's competitors, including Kerry, E & Y, and Hamilton Securities Group. *See* Hunt Decl. ¶ 27; Def.App. at 1632; Pl.Ex. 10 at 90–91;

Pl.Ex. 28 at 61; Pl.Ex. 46; PPF at ¶¶ 159, 162–63, 173; DR at ¶ 173; DPF at ¶ 155.

The AFS Contract specifically incorporated by reference the July 1993 RFP and six subsequent amendments,[21] as well as each of Ervin's proposals, dated August 27, 1993, as amended on September 24, 1993, and December 29, 1993. *See* Def.App. at 1044. The finalized SOW required that the selected contractor perform certain "task requirements"[22] and provide specific "deliverables"[23] concerning the AFS forms. *See* Def. App. at 1048–61.

The court has reviewed each of Ervin's proposals, including the December 29, 1993 BAFO, and found that these documents, in large part, are a narrative of Ervin's capabilities. *See* Def.App. at 554–1007; PPF at ¶¶ 41–44, 89. For example, in describing the comparative advantages of its proposal, Ervin advised HUD that:

> We are proposing to provide a full computerized *review* on all 16,000 financial statements at no additional cost to HUD [and] we also propose to complete a full *inventory* of all financial statement information instead of only the abbreviated review of the basic financial statements.

Def.App. at 982 (emphasis added).

What Ervin proposed, however, was a "review" and an "inventory." This language did not specify what the format or manner of delivery for Ervin's "review" and "inventory" would be. *See* Def.App. at 982.

Likewise, Ervin stated that "we would *expect to provide* a ratio and trend analysis (on hard copy and diskette) for each and every

project." Def.App. at 983 (emphasis added). A "draft format" of the type of analysis Ervin proposed was attached in an Exhibit B,[24] however, that document also was marked "For Illustrative Purposes Only." *See* Def. App. at 1006. In light of the illusory nature of Ervin's proposal regarding the ratio and trend analysis, such language would not support requiring Ervin to deliver ratio and trend reports by download, for *each and every project* (*i.e.*, 100% of the projects). *See* Restatement (Second) of Contracts § 2 comment e ("Words of promise which by their terms make performance entirely optional with the 'promisor' ... do not constitute a promise.").

To illustrate this point, the court suggests a comparison with other portions of Ervin's proposal, where the language used is more definite:

● All information in any way related to the collection and review of annual financial statements *will be collected and input* (electronically or manually) into one of a series of relational databases residing in a single central location on our IBM AS/400 mid-range system.

● Once all required information on a given project has been entered into the system and processed, it *will be converted* to a WordPerfect compatible format, and transferred to a 5.25″ diskette. This diskette will include the following: [a trend analysis of the project, mail ready draft audit letter, and three other HUD forms].

**21.** As a matter of law, the RFP is not an offer but a request for the submissions of offers, which then may be accepted (or not) by the Government. *See* John Cibinic, Jr. and Ralph C. Nash, Jr., Formation of Government Contracts 217 (1998). The RFP usually is issued on GSA Standard Form 33. *Id.* That was the case here. *See* Def. App. at 1.

**22.** The task requirements were: "collection of all fiscal year 1993 financial statements from owners (100% of inventory);" "completeness check of 100% of financial statements received;" "review of fiscal year 1993 financial statements (30% of inventory);" and "loading data into HUD provided software (100% of reports received)." Def. App. at 1051–53. The last requirement was spe-

cifically limited to the base year of the contract. *Id.* at 1053.

**23.** The "deliverables" included: "executive summaries and draft letters (to owners) [on] 5 –1/4″ floppy disks in a word processing software format compatible with WordPerfect (5.1);" a presentation at each field office after 50% of the reviews were completed; and, on a monthly basis, "information required for entry into the Multi-Family Insured Processing System (MIPS, a HUD computer system) and/or other HUD automated data systems." Def.App. at 1054–55.

**24.** Exhibit A illustrated the contents of the database used to generate Exhibit B. *See* Def.App. 981, 996.

● Similarly, all information required to be loaded to FO–MNS and/or MIPS systems *will be downloaded and converted* to the required file type and layout and placed on whatever electronic media is most useful for HUD.

Def.App. at 987–88 (emphasis added).

Therefore, the court must look elsewhere in the record to determine whether "Ervin was required by the contract to provide periodic downloads of the financial statement data to the Government." Def. Mot. S.J. at 16 (citing Def.App. at 1044–55).[25] The AFS Contract has two provisions that provide such evidence.

First, the AFS Contract provides that the contractor is required to provide: "data tracking and all data from the Statement of Profit and Loss, Form HUD 92410, and current assets and liabilities from the Balance Sheet, owners equity, accounts payable (other than regular tenants), and accounts receivable (tenants) for downloading to the Field Office Multifamily National System (FO–MNS) on a 5–1/4″ floppy disc for all fiscal year 1993 financial statements along with the previous two years if not already loaded into the system." Def.App. at 1053. Second, the contractor is required to deliver "information required for entry into the Multifamily Insured Processing System ('MIPS') and/or other HUD automated data systems.... [But it] must be on HUD provided software." Def.App. at 1055; *see also id.* at 1038–43 (identifying downloading/database design costs and downloading/programming costs included in Ervin's proposal). The court finds that these directives in the AFS Contract require Ervin to provide HUD with data from the AFS forms by downloading it in a manner that can be utilized by HUD's automated data systems.

The court also has considered the fact that HUD did not provide Ervin with the required software for the delivery of FOMNS data, as HUD has conceded. *See* Def. Mot. S.J. at 14; Pl.Ex. 2 (Exhibit 2 to Hylton Deposition, Federal Defendants' Answer to Plaintiff's First Set of Requests for Admissions at ¶ 23, *Ervin & Assocs. v. Dunlap,* No. 96–1253 (D.D.C.) ("The Federal Defendants admit that HUD never provided Ervin with a software program for loading data tracking and other data from the financial statements. The Federal Defendants allege that HUD worked together with Ervin to develop the system requirements for collecting annual financial statement data that would be loaded into FO–MNS and that Ervin was able to perform without a government-furnished software program.")). HUD's failure to provide the software at issue, however, was not material to Ervin's ability to perform under the contract. *See Stone Forest Industries, Inc. v. United States,* 973 F.2d 1548, 1550 (Fed.Cir.1992) (holding "not every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract, thereby allowing the non-breaching party to cease its performance and seek appropriate remedy."); RESTATEMENT (SECOND) OF CONTRACTS § 241 cmts. a & b (1981). Therefore, the court finds there was no breach that would relieve Ervin from its obligation to provide HUD with the data downloads, expressly as required by the AFS Contract.

### a. There Was No Constructive Change To The AFS Contract.

■ Ervin contends that HUD's demands for data downloads amounted to a constructive change to the AFS Contract. *See* Pl. Cross–Mot. at 1, 14, 38–40.[26] HUD counters

---

25. Ervin also contends that HUD violated the Brooks Act, 40 U.S.C. § 759 (1994), which, at the time the RFP was issued, required federal agencies to obtain a delegation of procurement authority from the General Services Administration for any acquisition of "automatic data processing equipment and related support services." Pl. Cross–Mot. S.J. at 6; PPF at 41–42. No "equipment" was purchased under the AFS Contract and therefore no "support services" for such equipment were required. *See* Def.App. at 1044–90; DR at ¶¶ 41–42. Whether HUD violated the

Brooks Act, however, is not relevant to whether the AFS Contract required the contractor to provide HUD with data downloads.

26. Although the remedy for a constructive change is equitable adjustment, the United States Court of Appeals for the Federal Circuit has held such a request is analogous to a breach of contract claim over which the court has jurisdiction. *See James M. Ellett Constr. Co., Inc. v. United States,* 93 F.3d 1537, 1542, 1546 (Fed.Cir.1996).

that no changes were made to the AFS Contract and, in any event, Ervin never properly informed the CO that Ervin was being asked to perform extra-contractual work. *See* Def. Mot. S.J. at 17–21; *see also* Def.App. at 1084–87 (FAR § 52.243–7, "Notification of Changes" Clause, incorporated into the AFS Contract, requiring notice to the CO).[27]

Ervin does not contest that it failed to notify the CO of HUD's requests for allegedly extra-contractual data downloads. *See* Def.App. at 1636–40; *see also* Pl. Cross–Mot. S.J. at 15, 20–23, 39–40 (failing to provide any record citations of notice to the CO). Instead, Ervin claims it notified other HUD employees who were in a position to convey this information to the CO or the CO "either knew or should have known of Ervin's contention that the data downloads were not required." Pl. Cross–Mot. S.J. at 15, 20–26, 39.

In light of Ervin's representations regarding its experience as a government contractor with a significant prior working relationship with HUD, the court finds that it is Ervin that knew or should have known of the requirement to inform the CO directly of any issues regarding the contract. *See* Def.App. 588–89 ("Ervin and Associates has extensive experience in developing and using computer systems for managing large portfolios of real estate and loans to include analyzing financial and other data for HUD multifamily projects."); *see also Ervin and Assocs. v. Dunlap,* 33 F.Supp.2d 1, 4 (D.D.C.1997) ("Ervin has been a contractor for HUD since 1989. In each of the years 1994 and 1995, he performed approximately $7 million of work on HUD contracts."); *Ervin and Assocs. v. United States,* 44 Fed.Cl. 646, 648–51 (1999) (discussing HUD's award of the Co–Insurance Contract to Ervin on September 20, 1990, a Technical Assistance Contract awarded to Ervin on January 2, 1992, an Asset Management Contract awarded to Ervin on September 21, 1993, Delegated Processing Contracts awarded to Ervin on December 1, 1993 and August 1, 1993, and a Physical Inspection Contract awarded to Ervin on

April 22, 1994.). All of these contracts, other than the latter, were awarded to Ervin before the AFS Contract was awarded on February 14, 1994. Therefore, if there had been a request for work beyond that required by the AFS Contract, appropriate notification to the CO at least would have allowed HUD the opportunity to make an inquiry and address the situation. *See Calfon Constr., Inc. v. United States,* 18 Cl.Ct. 426, 439 (1989), *aff'd,* 923 F.2d 872 (Fed.Cir.1990) ("[C]ontractors are duty bound to inform the contracting officer if official direction will result in claims against the Government.").

In the alternative, Ervin argues that the negotiations regarding Task Order 2 evidence a constructive change to the AFS Contract. *See* Pl. Cross–Mot. S.J. at 10, 20–23. Ervin deleted two provisions of Task Order 2, after it was forwarded by the CO. *See* Pl. Cross–Mot. S.J. at 21; Hunt Decl. at ¶ 25; PPF at ¶ 150; *compare* Pl.Ex. 41 *with* Def. App. at 1098–1120. One provision concerned production of data for the LLR calculation. *Id.* The other required "information required for entry into the FO–MNS *and/or other [HUD] automated data systems." Id.* (emphasis added for language Ervin deleted from the draft when the revised Task Order was returned to GTM Miller). Ervin claims that these two requirements did not appear in the original SOW. *See* Pl. Cross–Mot. S.J. at 21. This is incorrect. The reference to "other HUD automated data systems" is found in Item 3 of the list of "deliverables" to be provided under the AFS Contract. *See* Def.App. at 1055. The CO's elimination of the other language in Task Order 2 is irrelevant and in no way changes the AFS Contract, which required Ervin to provide HUD with data from the AFS forms. What HUD chose to do with the data, including use for the LLR calculation, was in no way constrained by any language in the AFS Contract.

**b. No Separate Implied–in–Fact Contract Was Created.**

■ Ervin alleges that a separate implied-in-fact contract arose from Ervin's Septem-

---

**27.** This FAR provision, incorporated into the AFS Contract, required that the CO be notified within 15 days whenever a contractor "identifies any Government conduct (including actions, in-

actions, and written or oral communications) that the Contractor regards as a change to the contract terms and conditions." 48 C.F.R. § 52.243–7; *see also* Def.App. at 1085.

ber 21, 1995 transmittal letter, attached to the Syquest disk containing 1993 and 1994 AFS data, to which HUD did not respond. *See* Hunt Decl. at ¶ 27; *see also* Pl. Cross–Mot. S.J. at 17–20. A related allegation is that HUD breached a second implied-in-fact contract requiring payment for HUD's use of the Conditions Notebooks. *See* PPF at ¶ 151; Pl. Cross–Mot. S.J. at 49.

Ervin's brief makes much over *Padbloc Co., Inc. v. United States*, 161 Ct.Cl. 369, 1963 WL 8492 (1963) and *Airborne Data, Inc. v. United States*, 702 F.2d 1350 (Fed.Cir. 1983), each of which found an implied-in-fact contract was created when the Government used unsolicited information received by a contractor. These decisions were both decided well before the FAR regulations were issued in 1984 and the "Rights In Data–General" Clause was implemented in 1987 to provide specific guidance as to what intellectual property rights the Government was entitled when it contracts with private parties. *See* 48 C.F.R. § 52.227–14. In addition, they were decided before this issue was addressed by the United States Court of Appeals for the Federal Circuit. *See Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir.1990), *cert denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990) ("The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract."). Accordingly, the court affords neither decision nor that of *Research, Analysis & Development, Inc. v. United States*, 8 Cl. Ct. 54 (1985) any precedential or deferential authority. In this case, the data downloads and Conditions Notebook at issue were subject to an express contract.

### 2. The FAR "Rights In Data–General" Clause Provided HUD With "Unlimited Rights" To All Data "First Produced" Under The AFS Contract.

HUD also seeks summary judgment that the "Rights In Data–General" Clause provided HUD with "unlimited rights" to information "first produced" under the AFS Contract. *See* Def. Mot. S.J. at 21–26. Ervin claims otherwise. *See* Pl. Mot. S.J. at 26–37.

#### a. The AFS Contract Incorporated The "Rights In Data–General" Clause.

The AFS Contract refers to the standard FAR "Rights In Data–General" Clause, but there is no specific language that states that this provision is incorporated into the AFS Contract, in contrast to other provisions of FAR that were incorporated by explicit language. *Compare* Def.App. at 1070 (listing several FAR sections prefaced by the explanation: "This contract incorporates one or more clauses by reference with the same force and effect as if they were given in full text.") *with* Def.App. at 1080 (listing several FAR sections with no such explanation). In fact, it appears that the reference to the "Rights In Data–General" Clause in the AFS Contract was simply "cut and pasted" into the document, along with several other FAR sections.

The United States Court of Appeals for the Federal Circuit has held that the general rules of interpretation apply when the United States is a party to a contract. *See Scott Timber Co. v. United States*, 333 F.3d 1358, 1366 (Fed.Cir.2003). The purpose of contract interpretation is to carry out the intent of the parties. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991).

The isolated reference to FAR § 52.227–14 in the AFS Contract can be analyzed two ways. First, if this issue is considered as a matter of missing language, the court may supply "a term which is reasonable under the circumstances" where such language provides "a reasonable meaning to all of [a contract's] ... parts [which is] ... preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless [or] superfluous[.]" *Gould, Inc.*, 935 F.2d at 1274; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981). Accordingly, the court finds that the FAR provisions at Def.App. at 1080 (listed immediately before Contract Section I–18) should be read as if the prefatory language found at Def.App. at 1070 (in I–8) is repeated at the top of Def.App. at 1080.

On the other hand, if the absence of contract language is viewed as an issue of ambi-

guity, the court should first determine whether the ambiguity is patent or latent. *See Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed.Cir.1999) (citations omitted); *see also Comtrol, Inc. v. United States*, 294 F.3d 1357, 1365 (Fed.Cir.2002) ("A patent ambiguity is one that is glaring, substantial, or patently obvious."). The doctrine of patent ambiguity is "an exception to the general rule of *contra proferentem* which construes an ambiguity against the drafter ... An ambiguity is patent if 'so glaring as to raise a duty to inquire[.]' If an ambiguity is latent, [the Federal Circuit] enforces the general rule." *Metric*, 169 F.3d at 751.

In this case, the isolated reference to the "Rights In Data–General" Clause is patently ambiguous. The record contains numerous references to Ervin's prior contract expertise.[28] Therefore, if there were any question regarding the applicability of the "Rights In Data–General" Clause, one would expect that an experienced government contractor, like Ervin, would make an inquiry, particularly in light of Ervin's view that the EMFIS, components thereof, and all resulting output was proprietary. *See J. Ervin Decl. at 20.* Accordingly, under these circumstances, any ambiguity should not be construed against HUD, although sloppy drafting likely contributed to the confusion among HUD employees regarding what data rights HUD actually acquired under the AFS Contract.[29]

The downloads HUD requested of Ervin were for data created in accordance with Ervin's proposals, which represented that all AFS data would be entered into Ervin's computer systems. *See Def.App. at 982–83.* Because that data did not exist until Ervin performed under the AFS Contract, necessarily they were "first produced in the performance of the contract." HUD, therefore,

obtained unlimited rights in the data and the data downloads. *See* 48 C.F.R. § 52.227–14(b)(1).

### b. Ervin Failed To Protect Its Alleged Proprietary Data With The Required Limited Rights Or Restricted Rights Notices.

■ Under the FAR, "data" is defined as "recorded information, regardless of the form or media in which it may be recorded and includes both technical data [30] and computer software." [31] 48 C.F.R. § 52.227–14(a). The Government can acquire data with "unlimited rights," "limited rights" or "restricted rights." *See* 48 C.F.R. § 52.227–14(a). As a matter of law, the Government obtains "unlimited rights" in all data "first produced" under a government contract, but the contractor may assert that certain data is instead "limited rights" data or "restricted rights" computer software. *See* 48 C.F.R. § 52.227–14(b)(iv), (g).

If the contract requires the delivery of "limited rights" data, the contractor may, however, provide the data with a prescribed "Limited Rights Notice" that sets forth the precise conditions under which the Government may disclose data to third parties, *i.e.,* only if the third parties are prohibited from any further use and disclosure. *See* 48 C.F.R. § 52.227–14(g) and Alt. II (Limited Rights Notice (June 1987)), "Technical Data" may be delivered with "limited rights," however, if challenged by the Government, the contractor must assert and establish that the data was "developed at private expense" and that the data "embody trade secrets" or are "commercial or financial" and "confidential or privileged." *See* 48 C.F.R. § 52.227–14(a), (e). It the contractor does not provide the required notice, it must withhold delivery of the data and provide instead "form, fit, and

---

28. *See, e.g.,* J. Ervin Decl. at ¶¶ 3–5, 10–13; Hunt Decl. at ¶¶ 2–3; S. Ervin Decl. at ¶¶ 3–5; Def. App. at 588–89, 979 ("[O]ur proposed approach will produce significantly more short and long term 'Bang for the Buck' for HUD than any other prospective contractor because of our: HUD housing expertise[.]").

29. *See, e.g.,* Pl.Ex. 3 at 227–63; Pl. Exs. 45, 53, 54, 65, 80–81; DR at ¶ 182.

30. The FAR defines "technical data" as "data (other than computer software) which are of a specific or technical nature." 48 C.F.R. § 52.227–14(a).

31. The FAR defines "computer software" broadly to include "computer programs, computer databases, and documentation thereof." 48 C.F.R. § 52.227–14(a).

function data." *See* 48 C.F.R. § 52.227–14(g)(1).

If the contract requires the delivery of "restricted computer software," the contractor may affix a prescribed "Restricted Rights Notice," that sets forth the more limited conditions under which the Government may disclose data to third parties. *See* 48 C.F.R. § 52.227–14(g) and Alt. III (Restricted Rights Notice (June 1987)). Computer software may be delivered with "restricted rights," but the contractor also must, if challenged by the Government, assert and establish that the software was "developed at private expense and [that] it is a trade secret; is commercial or financial and is confidential or privileged; or is published, copyrighted computer software." 48 C.F.R. § 52.225–14(a); *see also* § 52.225–14(e), (g).

Ervin asserts that it self-funded the creation of the EMFIS prior to the award of the AFS Contract, but upgraded its databases after the award. *See* J. Ervin Decl. at ¶¶ 12, 21; PPF at ¶¶ 8, 68. HUD disagrees. *See* DR at ¶¶ 8, 68. Ervin, however, did not specify what components of the EMFIS were developed at private expense. Ervin represents that it paid NHP for the rights in "NHP's systems." See J. Ervin Decl. at ¶ 10; *see also* PPF at ¶ 7. The record, however, reflects that Ervin, in fact, obtained a perpetual license but only for certain unspecified computer programs and software. *See* Pl.Ex. 12. In addition, Ervin also had considerable contracting experience with HUD prior to being awarded the AFS Contract and that the EMFIS was created, at least in part, in connection with Ervin's performance of the 1990 Co–Insurance Contract and 1993 Asset Management Contract. *See, e.g.,* J. Ervin Decl. at ¶¶ 4, 7, 11–13, 21, 23–24; Def. App. at 588–89; Pl. Cross–Mot. S.J. at 4. Any AFS data in the EMFIS that resulted from work performed under the 1990 Co–Insurance Contract and 1993 Asset Management Contract, however, still would be subject to the "Rights In Data–General" Clause, which has been in effect since June 1987. In addition, four interrelated databases were developed after the AFS Contract was awarded, *i.e.,* the Project Information Database; Tracking Database; Financial State-

ment Database; and Draft Financial Statement Letter and Analysis Database. *See* Def.App. 596, 991–93, 1139, 1484; DR at ¶ 23.

In *Bell Helicopter Textron,* ASBCA No. 21,192, 85–3 BCA ¶ 18,415, 1985 WL 17050 (1985), the Board held that if no legend was affixed to data, the Government takes "unlimited rights" under the "Rights In Technical Data" Clause (used by the Armed Services after 1969, a predecessor to the similar "Rights In Data–General" Clause), but where the wrong legends were affixed, further inquiry is required to determine whether the data at issue was "limited rights data," *i.e.,* data "developed at private expense." *Id.* at 92,426–32, 1985 WL 17050. The Board, however, severely limited the potential scope of such data, finding that "[a]ny ... [g]overnment reimbursement ... as a direct or indirect cost, of some of the costs of developing an item, component, or process would mean that that item, component, or process was not developed 'at private expense.'" *Id.* at 92,423, 1985 WL 17050; *see also Megapulse, Inc.,* 1980 WL 17275 at *10, 1980 U.S. Comp. Gen. LEXIS 3819 at *10 (1980) (holding that where there is a "mixture of private and government funds, development is not at private expense and the Government gets unlimited rights to all the data.").

Ervin did not establish that the EMFIS or its components were developed solely at private expense. First, the databases of AFS data were created per Ervin's proposals. Second, they did not exist until the performance began under the AFS Contract. Third, they were required under the AFS Contract, under which Ervin was paid for its services. Moreover, Ervin admitted in its AFS proposal that the EMFIS "currently maintains (prior to the award of the AFS Contract) financial data on over 400 annual financial statements, covering a period of three years or more[.]" Def.App. at 610, *see also supra* n. 33. Therefore at least a portion of the data at issue was developed at Government expense under the Co–Insurance Contract and Asset Management Contract. Based on this record, the court cannot conclude that the EMFIS or components thereof were developed at private expense.

Even if some databases at issue were developed at Ervin's expense and could qualify as "limited rights" data, as Ervin argues, Ervin was required under FAR to withhold the data after identifying it and furnishing "form, fit, and function data" in its place, or affix the specified notices. *Compare* Pl. Cross–Mot. S.J. at 35–37 *with* 48 C.F.R. § 52.227–14(g)(1) and Alt II, III. Ervin never withheld any data and provided "form, fit, and function data" in its place. Moreover, Ervin did not deliver any of the data with either "limited rights" or "restricted rights" notices. *See* 48 C.F.R. § 52.227–14(g), Alt. II, III; *see also* Def.App. at 1172–87, 1189–1243. Instead, Ervin claims that oral statements, letters, and e-mails to a variety of other HUD officials provided sufficient "limited rights" notice under the "Rights In Data–General" Clause. *See* Pl. Cross–Mot. S.J. at 26–31, 35–36. These communications did not comply with the manner of notice prescribed by FAR and therefore, even if the Government did not already have unlimited rights and even if Ervin's data and EMFIS were developed at private expense, the Government nonetheless acquired "unlimited rights" in all technical data and computer software delivered under the terms of the AFS Contract. In short, Ervin's warnings were both too late and to little.

**c. No Facts Have Been Asserted That Would Justify The Imposition Of Equitable Estoppel In This Case.**

■ The United States Court of Appeals for the Federal Circuit requires satisfaction of four elements before a party can prevail on a claim of equitable estoppel against the United States:

(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Burnside–Ott Aviation Training Ctr., Inc. v. United States,* 985 F.2d 1574, 1581 (Fed.Cir. 1993).

■ Recently, the Federal Circuit held in *Rumsfeld v. United Technologies Corp.,* 315 F.3d 1361 (Fed.Cir.2003) that:

Although the Supreme Court has not adopted a *per se* rule prohibiting the application of equitable estoppel against the government under any circumstances, it has made it clear that 'the government may not be estopped on the same terms as any other litigant.' *Heckler v. Community Health Servs.,* 467 U.S. 51, 60[, 104 S.Ct. 2218, 81 L.Ed.2d 42] (1984). In particular, the Court has suggested that if equitable estoppel is available at all against the government some form of *affirmative misconduct* must be shown in addition to the traditional requirements of estoppel.... While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court [the Federal Circuit] has done so, as has every other court of appeals.

*Id.* at 1377 (quoting *Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed.Cir.2000)) (citations omitted) (emphasis added).

Ervin claims that, even if the "Rights In Data–General" Clause applies to the AFS Contract, HUD is estopped from relying on it because HUD "consistently stated in writing that the databases belonged to Ervin and the data downloads were not required by the AFS Contract." Pl. Cross–Mot. S.J. at 16. It is not surprising that Ervin cites no authority for this proposition because it cannot in light of the requirements of the AFS Contract. *See* Def.App. at 1044–55. Moreover, even Ervin admits that four of the databases were not created until after the AFS Contract was awarded. *See* Def.App. at 596, 991–93, 1139, 1484; DR at ¶ 23.

Instead, Ervin presents an assortment of other actions as evidence of HUD's misconduct. Ervin claims that officials either affirmatively agreed not to share Ervin's databases with its competitors or were silent when Ervin advised HUD not to do so. *See* Pl. Cross–Mot. S.J. at 26–31. As previously discussed, there is no language in the AFS Contract that prohibited HUD from sharing the results of the AFS Contract with any third party. Ervin also claims that the fact

that certain language was removed from Task Order 2 by the CO evidences conduct that justifies estoppel. *Id.* at 29; PPF at ¶¶ 147–49. The CO's decision not to include redundant language in revised Task Order 2 regarding a term already required by the AFS Contract is irrelevant and in no way changes the terms or validity of the AFS Contract.

In addition, Ervin argues that misconduct is established by HUD's failure to follow certain procedures in the "Rights In Data–General" Clause. *See* Pl. Reply at 15–16, 22–24, 28. Ervin contends that the holding of *Bell Helicopter* requires that HUD be estopped from relying on the "Rights In Data–General" Clause. *See Bell Helicopter* at 92,-428, 1985 WL 17050 ("[P]rocedural requirements in the government's own regulations will be strictly enforced against the government before the contractor will be held to forfeit a claim or property right."); *see also* Pl. Reply at 25. The procedures at issue here, similar to those in *Bell Helicopter*, require the CO, after receiving unauthorized restrictive markings, to make a written inquiry affording the contractor 30 days to justify its restrictions. If the Government disagrees with the justification, the CO has to obtain a superior's concurrence and issue a written decision. *See* 48 C.F.R. § 52.227–14(e). Ervin's September 21, 1995 letter requesting proprietary treatment of a data download provided to HUD is not a "restrictive marking" in the sense it is used in FAR. In any event, even if the CO failed to make a written inquiry, such a failure does not rise to the level of affirmative misconduct.

Finally, to bolster its estoppel argument, Ervin proffers the opinions of HUD personnel that "Ervin's data" were not subject to Freedom of Information Act requests. *See* Pl. Cross–Mot. S.J. at 27–29. These opinions, however, do not bind the agency as to whether the "Rights In Data–General" Clause applies to the AFS Contract, nor do they evidence affirmative misconduct.

The court has found no evidence in the record of "affirmative misconduct" of a qualitative nature that would invoke the doctrine of equitable estoppel against the Government in the circumstances presented here. Moreover, Ervin settled allegations previously asserted in the United States District Court concerning acts HUD personnel may have taken to threaten, retaliate, or discriminate against Ervin, and therefore it is precluded from resurrecting them in this proceeding to evidence affirmative misconduct. *See* Pl.Ex. 61. Therefore, as a matter of law, Ervin is not entitled to invoke the doctrine of equitable estoppel to deny HUD the scope of the "Rights In Data–General" Clause.[32]

### 3. There Was No Infringement Of Ervin's System Or Components Thereof.

#### a. The EMFIS Was Not Infringed.

■ Ervin registered and received a copyright on "certain aspects of its EMFIS system." J. Ervin Decl. at ¶ 14; Def.App. at 1652–53; PPF at ¶ 17. Ervin stated that the "copyrighted features" included "the particular manner used to *process* individual AFSs (which incorporates Ervin's standardized *methods* and approaches[.]"). Ervin Decl. at ¶ 14; PPF at ¶ 7 (emphasis added); *see also* Pl. Cross–Mot. S.J. at 27–30. Elsewhere, Ervin asserts that HUD copied its proprietary computer "systems," *i.e.*, the computerized *process* by which Ervin identified "conditions" and produced follow-up letters responding to those conditions. *See* Pl. Cross–Mot. S.J. at 51–54. It is well established that such subject matter is not copyrightable. *See* 17 U.S.C. § 102(b); *Atari Games Corp. v. Nintendo of America, Inc.,* 975 F.2d 832, 842 (Fed.Cir.1992) ("To protect *processes* or *methods of operation,* a creator must look to patent law[.]" (emphasis added)). Ervin never applied for a patent on the EMFIS. *See* 35 U.S.C. § 103.

Ervin also contends, however, that HUD "reverse-engineered Ervin's system" without Ervin's permission. Pl. Cross–Mot. S.J. at

---

**32.** In making this determination, the court does not wish to imply that it condones the totality of HUD's actions regarding the supervision and implementation of the AFS Contract. The court is satisfied, however, that those issues have been fairly resolved by the October 5, 2000 settlement. *See* Pl.Ex. 61 at ¶ 14.

3. Reverse engineering is defined as "starting with the known product and working backward to divine the process which aided in its development or manufacture." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879 40 L.Ed.2d 315 (1974). It is true that aspects of the EMFIS were embodied in computer programs distributed to HUD on a disk, however any effort to reverse engineer them would have been very expensive and technically difficult, if not infeasible. *See, e.g., Atari Games Corp.,* 975 F.2d at 844 n. 6 (observing that "the idea or process expressed in a [computer] program is not easily discernable from object code."). Nevertheless, assuming HUD did engage in reverse engineering, our appellate court has carefully explained the reasons why such activity qualifies under the "fair use" exception to the copyright law:

> The author does not acquire exclusive rights to a . . . work in its entirety. Under the [copyright] act, society is free to exploit facts, ideas, processes, or methods of operation in a copyrighted work. . . . An author cannot acquire patent-like protection of putting an idea, process or method of operation in an unintelligible format and asserting copyright infringement against those who try to understand that idea, process or method of operation. *See, e.g., Feist [Publications, Inc. v. Rural Telephone Service Co., Inc.],* 499 U.S. at [347–48, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)]; 17 U.S.C. § 102(b).

*Atari Games Corp.,* 975 F.2d at 842; *see also Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1539 n. 18 (11th Cir.1996); *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1527–28 (9th Cir.1992); *Vault v. Quaid,* 847 F.2d 255, 270 (5th Cir.1988).

For these reasons, the court holds that the EMFIS was not copyrightable and therefore, as a matter of law, was not infringed by HUD.

### b. The Components Of The EMFIS Were Not Infringed.

At various places in Ervin's briefs and appendix references, Ervin asserts that its computer screens, computer programs, and/or computer databases were infringed.

Therefore, each of these claims will be examined.

### (i) Computer Screens.

■ One of the first tasks that Ervin undertook after the AFS Contract was awarded was to design computer screens to enable Ervin to "input all information from each AFS into a Database." PPF at ¶ 9; *see also* Hunt Decl. at ¶ 5. Again, however, 17 U.S.C. § 102(b) provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, or method of operation[.]" Although the issue of whether a computer screen is copyrightable has not been addressed directly by the United States Supreme Court nor the United States Court of Appeals for the Federal Circuit, the court is persuaded that a computer screen is a "method of operation" and subject matter that is not copyrightable. *See Apple Computer, Inc. v. Articulate Systems, Inc.,* 234 F.3d 14 (Fed.Cir.2000) (considering whether the method of displaying data on a computer screen was subject to patent infringement); *see also Lotus Dev. Corp. v. Borland, Int'l,* 49 F.3d 807 (1st Cir.1995), *aff'd,* 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996) (holding that a menu command hierarchy is not copyrightable because it is a "method of operation"); *MiTek Holdings v. Arce Engineering Co.,* 89 F.3d 1548 (11th Cir.1996) (holding menu tree structure not copyrightable, but subject to province of patent laws); *but see Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852 (2d Cir.1982) (holding "repetitive sequence of images is copyrightable as an audiovisual display.").

To paraphrase the words of the Honorable Michael Boudin, now Chief Judge of the United States Court of Appeals for the First Circuit, "To call [a computer screen] a method of operation is, in the common use of those words, a defensible position. After all, the purpose of [a computer screen] is not to be admired as a work of literacy or pictorial art. It is to transmit directions from the [computer] to the [user]. The [computer screen] also is a method in the dictionary sense because it is an 'order or system,' and (aptly here) an 'orderly or systematic ar-

rangement, sequence, or the like.' *Random House Webster's College Dictionary* 853 (1991)." *Borland, Int'l,* 49 F.3d at 821 (Boudin, J. concurring).

For these reasons, the court holds that Ervin's computer screens were not copyrightable and therefore, as a matter of law, could not be infringed by HUD.

### (ii) Computer Programs.

■ HUD does not take issue with the fact that Ervin filed a copyright application on November 20, 1995, regarding a "computer program to process and review annual financial statements." Def.App. at 1654–55; PPF at ¶ 153. And, there is no dispute that Ervin requested a copyright on the following programs: a program to log all sections of Financial Statement Received, written on March 1, 1994; a program to enter the Account Balance, written on February 17, 1994; and a program to print Finding Letters From Work File, written on May 11, 1994. *See* Def.App. at 1656–74; PPF at ¶¶ 153–55.

It is well settled that the literal elements of computer programs, *i.e.,* source code and object code, are copyrightable. *See Computer Assocs., Int.'l v. Altai, Inc.,* 982 F.2d 693, 702 (2d Cir.1992). Ervin, however, does not claim that HUD copied either Ervin's source code or object code. Therefore, any infringement claim regarding Ervin's computer programs would require Ervin to claim substantial similarity between the non-literal components of its computer programs and HUD's, which has not been raised as an issue in this case, likely because Ervin's programs in fact may have no protected elements. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 348, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (the "mere fact that a work is copyrighted does not mean that every element of the work may be protected."); *see also Altai,* 982 F.2d at 710

(excluding elements of a computer program dictated by efficiency, elements dictated by external factors, and elements taken from the public domain from copyright protection).

In this case, however, a substantial similarity inquiry is not required because all of the computer programs in dispute were created to fulfill Ervin's obligations under the AFS Contract and were "first produced" to perform that work and therefore were subject to the "Rights In Data–General" Clause. *See* 48 C.F.R. § 52.227–14(c)(2). Under this FAR provision, a contractor cannot incorporate copyrighted data *"not first produced in the performance of this contract"* into data *"delivered under this contract"* without the grant of an unlimited license to the Government. *Id.* (emphasis added). Therefore, even if elements of Ervin's computer programs, developed before the AFS Contract was awarded, were used in other programs to perform the AFS Contract, any pre-existing copyrightable interest in Ervin's programs was subject to FAR. For these reasons, the court holds that any copyrightable elements of Ervin's computer programs were subject to FAR, which does not permit the incorporation of prior copyrighted material without the permission of the CO or providing the Government with an unlimited license. *See* 48 C.F.R. § 52.227–14(c)(2).

Moreover, although FAR affords "restricted computer software" special protection, it must be software that is "delivered at private expense and . . . a trade secret; is commercial or financial and is confidential or privileged; or is published copyrighted computer software, including minor modifications of such computer software." 48 C.F.R. § 52.227–14(a). Arguably, any software that Ervin developed prior to entering into the AFS Contract on February 14, 1994 would be entitled to "restricted treatment," if it were a trade secret,[33] confidential or copyrightable.

---

**33.** Whether any of Ervin's computer programs or elements thereof are a trade secret would be a matter to be determined under the Maryland Trade Secrets Act. *See* Md. Code Ann. Commercial Law § 11–201 (1990). Ervin, however, has placed no evidence in the record to demonstrate that its software had any "independent economic value [other than to HUD]," was not "generally known" or "readily ascertainable" by others, and

was subject to reasonable efforts to "maintain its secrecy." *See, e.g., Bond v. PolyCycle, Inc.,* 127 Md.App. 365, 371, 732 A.2d 970, 973 (1999); *see also* Def. Mot. S.J. at 31 (listing a series of allegations challenging the ownership and precise nature of "Ervin's data system."); S. Ervin Decl. at ¶ 7 ("Ervin had sophisticated computer systems and technology for processing multi fam-

For reasons previously discussed, however, the court need not make this determination since Ervin's computer software at issue in this case was not delivered at private expense. *See supra* at 296–97.

### (iii) Computer Databases.

■ Ervin also claims that it developed "databases of financial data on HUD's portfolio of multi-family mortgages," however, in its proposal, Ervin stated that: "The first step in this process will be to develop a series of four interrelated databases that will work together to collect all of the important information from each project ... Project Information Database; Tracking Database; Financial Statement Database; and Draft Financial Statement Letter and Analysis Database." Def.App. at 596, 991–93, 1139, 1484; DR at ¶ 23.

Since the Supreme Court's decision in *Feist*, it has been clear that a database of facts is not copyrightable without a "minimal degree of creativity." *Feist Publ'ns, Inc.*, 499 U.S. at 347–48, 111 S.Ct. 1282. The constitutional minimum for copyright protection requires that a database "feature an original selection or arrangement." *Id.* at 348, 111 S.Ct. 1282. Ervin has proffered no evidence of such creativity. Instead, the record reflects that the conditions and organization of the databases at issue were dictated by the intrinsic logic of the AFS forms and information HUD specified.

Moreover, FAR does not authorize special protection for databases, but instead provides that: "limited rights data that are formatted as computer databases for delivery to the Government are to be treated as limited rights data and not restricted computer software." 48 C.F.R. § 52.227–14(g). Accordingly, the contractor has the obligation to withhold a database, unless it is required to be delivered under the contract. *Id.* And, if the contractor seeks "limited rights" treatment it is required to provide the prescribed

"Limited Rights Notice" at the time of delivery. *Id.*

In this case, the AFS Contract required production of the databases that Ervin created, however, Ervin took none of the requisite steps to have its databases treated as "limited rights" data. *See* 48 C.F.R. § 52.227–14(f)(1). For these reasons, the court holds that the computer databases at issue were not copyrightable and, in any event, subject to FAR "limited rights" requirements, which Ervin did not follow. Therefore, as a matter of law, the databases could not be infringed by HUD.

### 4. The Conditions Notebook Was Not Infringed.

■ The first version of the Conditions Notebook was provided to HUD in 1994 without limited rights or copyright notices. Therefore, HUD acquired this version with "unlimited rights." *See* 48 C.F.R. § 52.227–14(b)(1)(iv) and (f)(1).[34]

All three versions of the Conditions Notebook were "first produced in performance of [the AFS Contract]." *See* Def.App. at 1998–2402; Compl. at ¶ 41. FAR provides, however, that "[t]he prior, express written permission of the [CO] is required to establish claim to copyright subsisting in all ... data first produced in the performance of the contract," other than certain articles for publication. 48 C.F.R. § 52.227–14(c)(1). If permission is granted, the contractor must provide the Government with a "paid-up, nonexclusive, irrevocable worldwide license in such copyrighted data[.]" *Id.*

There is no evidence in the record that Ervin requested written permission from the CO prior to delivering the 1995 version of the Conditions Notebook to HUD with a copyright notice. Ervin also did not seek written permission from the CO before registering its copyright for the 1996 Conditions Notebook, but instead, after delivery, demanded that HUD either return all copies of the 1996

ily information, which we initially acquired from the National Housing Partnership[.]").

**34.** FAR provides the Government with unlimited rights in "[a]ll other data delivered under this contract unless provided otherwise[.]" 48 C.F.R. § 52.227–14(b)(1)(iv). In addition, FAR provides that "[d]ata delivered to the [G]overnment [without notice of limited rights or copyright] shall be deemed to have been furnished with unlimited rights[.]" 48 C.F.R. § 52.227–14(f)(1).

version or pay Ervin copyright royalties. *See* Pl.Ex. 71. Ervin's actions ignored FAR's requirements.

Even if the Conditions Notebooks were not "first produced" in performance of the AFS Contract, they nonetheless were *delivered* thereunder as training material. *See* 48 U.S.C. § 52.227–14(b)(1)(iii) (providing the Government with unlimited rights in "[d]ata delivered under ... contract ... that constitute manuals or instructional and training material for installation, operation, or routine maintenance ... of ... processes delivered or furnished for use under this contract[.]"); *see also Litton Applied Technology*, Corp. Gen. Dec. 13–227090, 87–2 CPD ¶ 219, 1987 WL 102828 (holding that technological information in a manual could be used by the Government for any purpose since it was delivered with unlimited rights.). Therefore, the Government had "unlimited rights" to the Conditions Notebooks, as training material delivered under the AFS Contract. *See* 48 U.S.C. § 52.227–14(b)(1)(iii).

In addition, although Ervin included copyright notices with its delivery of the 1995 and 1996 Conditions Notebooks, FAR also governs the copyright of data "not first produced in the performance of this contract" in relation to data "delivered" under contract. *See* 48 C.F.R. § 52.227–14(c)(2). Under this provision, the contractor "shall not, without prior written permission of the Contracting Officer, incorporate in data delivered under this contract any data not first produced in the performance of this contract and which contains [a] copyright notice ... unless the [c]ontractor identifies such data and grants to the Government, or acquires on its behalf, a license of the same scope as set forth in ... (c)(1) of this clause." *Id.* The function of paragraphs (c)(1) and (c)(2) is to prevent a contractor from imposing potential copyright liability on the Government for data delivered under an existing contract.

The 1995 and 1996 version of the Conditions Notebook, while revised, retain much of the same information as the 1994 version, in which HUD had "unlimited rights." Although the 1995 and 1996 versions included a copyright notice, under FAR, Ervin could not incorporate copyrighted data not "first pro-

duced" under the AFS Contract into data that was "delivered" under the AFS Contract, without the express permission of the CO. *Id.* Therefore, as a matter of law, HUD's "unlimited rights" in the 1995 and 1996 versions of the Conditions Notebook were not diminished by Ervin's copyright notices.

Finally, Ervin argues that when HUD received the 1996 Conditions Notebook, HUD failed to challenge the copyright set forth. *See* 48 C.F.R. § 52.227–14(e); *see also* Pl. Reply at 34. This FAR provision, however, must be read with another providing the contractor "shall not" incorporate copyrighted data into data "delivered under this contract[.]" 48 C.F.R. § 52.227–14(c)(2). Again, Ervin disregarded this prohibition and accordingly, HUD had no legal obligation to challenge Ervin's copyright notice. Moreover, no affirmative misconduct occurred on the Government's part that would justify estoppel. *See supra* at 297.

**5. Ervin Had No Protected Property Interest In Data Downloads Of AFS Data Or In The EMFIS Or Components Thereof.**

Ervin alleges that HUD's provision of data downloads of AFS data to third parties was an unlawful taking of private property since Ervin provided the data under "duress" and on the "express condition" that this data would not be made available by HUD to Ervin's competitors. *See* Compl. at ¶ 51; Pl. Cross–Mot. S.J. at 38. Ervin also argues that HUD's unauthorized copying of components of the EMFIS is a taking of private property. *See* Compl. at ¶ 61; Pl. Cross–Mot. S.J. at 59.

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) the United States Supreme Court held that the Just Compensation Clause of the Fifth Amendment may apply when the Government discloses a contractor's commercial data that is a trade secret, in violation of an agreement to the contrary. As discussed above, however, the data downloads at issue belong to HUD by virtue of the terms of the AFS Contract and the "Rights In Data–General" Clause. Consequently, HUD had

the right to provide this information to third parties. No separate agreement to the contrary was created. Moreover, Ervin does not identify which "components" of the EM-FIS were "copied." Ervin had no patent, copyright or established trade secret interest in the EMFIS. Although it registered copyrights on certain computer programs, *i.e.,* a program "to log," a program "to enter," and a program "to print" (*see* Def.App. at 1656–74), as discussed previously, the *idea, method or process* of AFS review was not protectable under copyright law. Finally, since Ervin only obtained a license from NHP, portions of the EMFIS, in fact, may be the property of NHP, in which Ervin could not seek a copyright. *See supra* n. 5.

For these reasons, as a matter of law, the court holds Ervin had no protected property interest in the data downloads of AFS data or in components of the EMFIS, and therefore no Fifth Amendment taking occurred.

### D. Disposition Of Issues Raised By The Parties For Summary Judgment And The March 19, 2001 Complaint.

The Government's February 4, 2003 motion for summary judgment is granted in its entirety, Ervin's April 15, 2003 motion for summary judgment is denied in its entirety. All counts of the March 19, 2001 complaint are dismissed.

#### 1. Count 1–Breach of Contract (Data Downloads) Is Dismissed.

Count 1 of the March 19, 2001 Complaint alleges a breach of a contract formed by "HUD's acceptance of the data and subsequent data requests ... [creating] a binding contractual obligation ... HUD breached ... when it allowed other contractors to have access to Ervin's data." Compl. at ¶ 48. Both the Government and Ervin seek summary judgment as to Count 1. *See* Def. Mot. S.J. at 14–17; Pl. Cross–Mot. S.J. at 17–35. As previously discussed, as a matter of law, the AFS Contract specifically required Ervin to provide the downloads of AFS data in a manner that could be utilized by HUD's automated data systems. Because this issue was subject to an express contract, as a matter of law, no implied-in-fact contract

could exist regarding the same. Therefore, the Government's motion for summary judgment in this regard is granted and Ervin's cross-motion is denied. Count 1 is dismissed.

#### 2. Count 2–Fifth Amendment Taking (Data Downloads) Is Dismissed.

Count 2 alleges that HUD is required to pay just compensation for the unconstitutional taking of the "data downloads." Compl. at ¶ 51. Ervin seeks summary judgment as to Count 2. *See* Pl. Cross–Mot. S.J. at 37–38. The databases at issue were subject to the "Rights In Data–General" Clause, as property of HUD under the terms of the AFS Contract, and were never asserted as "limited rights" under FAR. Therefore, as a matter of law, Ervin has no constitutionally protected property interest in the "data downloads" and Ervin's motion for summary judgment on a taking claim regarding them is denied. Count 2 is dismissed.

#### 3. Count 3–Constructive Change (Data Downloads) Is Dismissed.

Count 3 alleges that HUD's request for "Ervin's" data downloads amounted to a constructive change of the AFS Contract. *See* Compl. at ¶ 54. Both the Government and Ervin seek summary judgment regarding Count 3. Def. Mot. S.J. at 17–21; Pl. Cross–Mot. S.J. at 38–40; *see also* Pl. Cross–Mot. S.J. at 20–23. The AFS Contract required Ervin to deliver the data downloads at issue and, in any event, Ervin never informed the CO of its view that HUD had changed the terms of the AFS Contract. Therefore, as a matter of law, no constructive change of contract occurred. Count 3 is dismissed.

#### 4. Count 4–Copyright Infringement Of The EMFIS Is Dismissed.

Count 4 of Ervin's Complaint alleges that HUD violated Ervin's copyright of the EM-FIS by creating "derivative works." *See* Compl. at ¶ 58. The Government seeks summary judgment as to Count 4. *See* Def. Mot. S.J. at 35–37. As a matter of law, Ervin's EMFIS was uncopyrightable. Although some of the components of the EMFIS were subject to copyright, Ervin was required un-

der FAR to provide the Government with a license to such components. Therefore, as a matter of law, HUD did not violate Ervin's copyright of the EMFIS. Count 4 is dismissed.

### 5. Count 5–Fifth Amendment Taking (Components of EMFIS) Is Dismissed.

Count 5 claims that HUD's "unauthorized copying of components of the EMFIS constitute a taking of private property, requiring just compensation to Ervin under the Fifth Amendment." Compl. at ¶ 66. The court has found that the Ervin had no protected property interest in the components of the EMFIS potentially copied, *i.e.*, the computer screen, computer programs, and databases. Therefore, no taking of private property occurred. Count 5 is dismissed.

### 6. Count 6–Breach of Contract (Conditions Notebook) Is Dismissed.

Count 6 of Ervin's Complaint alleges HUD's failure either to return the Conditions Notebook or pay Ervin additional compensation for the use of the Conditions Notebook was a breach of contract. *See* Compl. at ¶ 64. Both the Government and Ervin seek summary judgment regarding Count 6. *See* Def. Mot. S.J. at 37–47; Pl. Cross–Mot. S.J. at 40–46, 49–51. As previously discussed, Ervin created the Conditions Notebook "as a tool to prepare the draft letters to property owners required by CLIN 01 [of the AFS Contract]." Pl. Cross–Mot. S.J. at 43. The first version voluntarily was provided to HUD in 1994 for comment and later was used by Ervin in connection with its contractual obligation to hold training and follow-up sessions in the HUD field offices after half of the AFS forms were reviewed. *Id.* at 43–44.

HUD was under no obligation to return or pay Ervin for the Conditions Notebook, which was used by Ervin as a "tool" to perform its duties under the AFS Contract. No evidence supports Ervin's contention that HUD was required to compensate Ervin beyond the requirements of the AFS Contract for use of the Conditions Notebook. In addition, since the Conditions Notebook was "first produced" in the performance of the AFS Contract and is subject to the "Rights In Data–General" Clause, HUD had unlimited rights in the Conditions Notebook. Accordingly, as a matter of law, there was no breach of contract regarding the Conditions Notebook. Therefore, the Government's motion for summary judgment that the AFS Contract allowed HUD to use the Conditions Notebook without additional compensation is granted. Count 6 is dismissed.

### 7. Count 7–Copyright Infringement Of The Conditions Notebook Is Dismissed.

Count 7 of Ervin's Complaint alleges that HUD violated Ervin's copyright on the Conditions Notebook. *See* Compl. at ¶ 67. Both the Government and Ervin seek summary judgment regarding Count 7. *See* Def. Mot. S.J. at 32–33; Pl. Cross–Mot. S.J. at 46–48. Since the Conditions Notebook was subject to the "Rights In Data–General" Clause, any copyright that existed would have been required to be licensed to the Government. Accordingly, HUD's use of the Conditions Notebook did not violate copyright law. Count 7 is dismissed.

### CONCLUSION

For the foregoing reasons, the Government's February 4, 2003 motion for summary judgment is hereby **GRANTED** in its entirety and Ervin's April 15, 2003 cross-motion for summary judgment is **DENIED** in its entirety. All counts of the March 19, 2001 complaint are dismissed. The Clerk of the Court is ordered to enter judgment consistent with this opinion.

**IT IS SO ORDERED.**